**LeCROY RESEARCH SYSTEMS COR-PORATION, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 55, Docket 84–4062.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 21, 1984.

Decided Dec. 20, 1984.

Stephen R. Field, New York City (Ira G. Greenberg, Burns, Summit, Rovins & Feldesman, New York City, of counsel), for petitioner-appellant.

David English Carmack, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Mary L. Fahey, Attys., Tax Division, Dept. of Justice, Washington, D.C., of counsel), for respondent-appellee.

Before OAKES, WINTER and PRATT, Circuit Judges.

WINTER, Circuit Judge:

LeCroy Research Systems Corporation ("LeCroy") appeals from the decision of the United States Tax Court disqualifying its wholly owned subsidiary LRS Export Corporation ("LRS") as a Domestic International Sales Corporation ("DISC") because commissions owed by LeCroy to LRS were not paid within sixty days of the close of LRS's tax year and thus were not "qualified export assets." The Tax Court affirmed the Commissioner's assessment of a deficiency against LeCroy of $84,858 for LeCroy's tax year ending June 30, 1975. Because we believe the retroactive application of certain regulations promulgated by the Commissioner was unlawful in light of prior assurances given to taxpayers, we reverse.

**4.** VW seeks to raise the venue issue. The issue was not decided by the district court and is thus not properly before us.

## BACKGROUND

In 1971, Congress enacted legislation designed to provide tax incentives for domestic corporations to increase their exports by granting them tax deferral benefits similar to those enjoyed by domestic corporations that use foreign subsidiaries to produce and sell goods abroad. *See* H.R.Rep. No. 533, 92d Cong., 1st Sess. 58, *reprinted in* 1971 U.S.Code Cong. & Ad.News 1825, 1872; I.R.C. §§ 991–997. Congress's purpose was not simply to remedy the disadvantaged position of domestic corporations as a matter of equity. Rather, the provisions in question were part of a package of revisions of the tax code designed to stimulate economic activity. The DISC provisions in particular were designed to "increase our exports and improve an unfavorable balance of payments." S.Rep. No. 437, 92d Cong., 1st Sess. 1, *reprinted in* 1971 U.S.Code Cong. & Ad.News 1918, 1918.

A DISC is not subject to federal income tax. Instead, one-half of its earnings are deemed constructive dividends, whether distributed to its shareholders or not, I.R.C. § 995(b), and the rest is not taxable to the shareholders until it is actually distributed or the DISC dissolves or becomes disqualified. *See* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 17.14 (4th ed. 1979). Thus, the tax advantage of a DISC is deferral of taxation on approximately one-half of the DISC's export earnings, a benefit intended by Congress to encourage reinvestment of the exempt earnings in export activities.

In January, 1972, shortly after the DISC provisions were enacted, the Secretary of the Treasury issued a Treasury Pamphlet entitled *Handbook for Exporters* (1972–1 C.B. 679) intended to aid businesses in understanding the DISC provisions. The *Handbook* consisted of three sections, the first two of which were intended as plain-language overviews of and discussions about DISCs. The third part, "DISC Explained," set forth more technical guidance to potential incorporators of DISCs. The handbook announced that it would follow the rules and procedures set forth under "DISC Explained," "[u]ntil such time as they may be modified in regulations or other Treasury publications. Any such modifications which may be adverse to taxpayers will apply prospectively only." Although regulations relating to DISC treatment were proposed in 1972, shortly after the *Handbook* was issued, the final regulations were not adopted until September, 1976.

The term "qualified export asset" is of central importance to achieving the tax benefits since 95% of a corporation's assets must at all times so qualify, I.R.C. § 992(a)(1)(B), or it loses DISC status entirely. This assets test for DISC eligibility was designed by Congress to ensure that the substantial benefits of tax deferral would be related to earnings re-invested in exporting. The *Handbook* generally provided that accounts receivable arising in connection with the DISC's export transactions were "qualified export assets." It gave as an example DISCs that acted as commission agents on export sales purchasing accounts receivable from the parent principal. It did not, however, expressly state whether an agent's commissions receivable from the principal would be a "qualified export asset." In October, 1972, nearly two years before the DISC in question was formed, the Commissioner published a number of proposed regulations under Section 933 relating to DISCs. Among these was Treas.Reg. § 1.993–2(d)(2), which provided that commissions receivable from the parent to the DISC must be paid within sixty days of the end of the DISC's tax year or lose their status as a "qualified export asset." Many of the proposed DISC regulations went through several revisions, but the sixty day proposal remained constant throughout, although it was moved to I.R.C. § 994 before promulgation in 1976.

LeCroy is engaged in the manufacture and sale of scientific measurement instruments used in the nuclear energy industry. It is an accrual basis taxpayer with a year ending on June 30. In July, 1974, LeCroy

formed a wholly owned subsidiary, LRS Export Corporation, incorporated under the laws of New York, as a non-exclusive commissions agent for LeCroy's export sales. LRS is an accrual basis taxpayer with a tax year ending July 31 and timely elected to be treated as a DISC for tax purposes.

Using the accrual method, LeCroy deducted sales commissions as they became payable to LRS pursuant to a non-exclusive commission agency agreement. Similarly, LRS recorded the commissions receivable as income. For LeCroy's fiscal years ending June 30, 1975 and June 30, 1976, LeCroy reported taxable dividends of $10,120 and $92,528, respectively, as Section 995(b) constructive dividends, and deductions for commissions owed to LRS of $186,408 and $239,027. ($18,388 is attributable to the LRS's one month start-up fiscal year of July 1, 1974 to July 31, 1974.) LeCroy did not actually pay the commissions of $20,-240 and $184,556 to LRS (the variance is due to the different fiscal years) until April 15, 1975 and April 6, 1976, on or near the fifteenth day of the nine-month period after the close of LRS's tax year, which was the date that LRS's 1974 and 1975 tax returns were due. I.R.C. § 6072(b).

In 1982, the Commissioner sent a notice of deficiency to LeCroy for failure to meet the 95% qualified export assets test for the 1974 and 1975 fiscal years in question because the commissions receivable were not paid by LeCroy to LRS within sixty days of the end of the DISC's tax year as required by Treas.Reg. § 1.994–1(e)(3)(i), which, as noted, had been proposed before, but promulgated after, the transactions in question. Pursuant to I.R.C. § 482, all of LRS's income was reallocated and taxed as income to its parent LeCroy.

LeCroy petitioned the Tax Court for a redetermination of the deficiency. Relying on *CWT Farms, Inc. v. Commissioner,* 79 T.C. 1054 (1982), the Tax Court held the regulation valid as enacted and as retroactively applied. It approved the reallocation of income to LeCroy as a proper exercise of the Commissioner's discretion. LeCroy then appealed.

### DISCUSSION

We uphold the decision of the Tax Court finding the regulation to be a valid exercise of the Commissioner's regulatory authority but reverse its retroactive application to LeCroy.[1]

■ We may quickly dispose of appellant's claim that the sixty day payment regulation, Treas.Reg. § 1.994–1(e)(3), is an invalid "legislative" condition on a DISC's status. Section 994(b) gives the Secretary of the Treasury specific authority to promulgate regulations setting forth "rules which are consistent with the rule set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income." The Committee reports explain the provision as follows:

> [T]he Secretary of the Treasury may prescribe by regulations intercompany pricing rules, consistent with those provided by the bill, in the case of export transactions where the DISC does not take title to the property, but instead, acts as commission agent for the sale, or is a lessee of the property which it then subleases to its customers.

S.Rep. No. 437 at 108, 1971 U.S.Code Cong. & Ad.News at 2014; H.R.Rep. No. 533 at 75, 1971 U.S.Code Cong. & Ad.News at 1888.

The challenged regulation directs that the commissions be paid to a related supplier within sixty days of the close of a DISC's tax year. Since time is money, some limit on the existence of intercorporate accounts receivable assures that the tax benefits of DISC status will not be unduly diverted from exporting. To the

---

**1.** Given our holding with regard to retroactive application, the issue of the validity of the regulation could technically be avoided in this case involving pre-1976 tax years. However, our discussion of the retroactive application of the regulation relies on readers' understanding its content, purpose and relationship to the overall statutory scheme. Since that discussion would necessarily reveal our view that it is integrally related to that scheme, we have chosen to address the validity issue openly.

same end, the legislation in question contains express limitations on loans from a DISC to its parent. I.R.C. § 993(d)(2), (3). However, the unrestricted use of DISC's unpaid commissions receivable by the parent would circumvent those limitations. The challenged regulation is thus within both the express authority and the spirit of the statute. *But see Thomas Int'l. Ltd. v. United States*, 6 Cl.Ct. 414 at 420–21 (1984) (time limitation not authorized by statute). We therefore hold Treas.Reg. § 1.994(1)(e)(3) to be a valid regulation.

■ However, we believe the retroactive application of the regulation to be an abuse of discretion. The *Handbook* expressly promised that rules and procedures set forth in "DISC Explained" would be "modified in regulations or other Treasury publications" in a way adverse to taxpayers only on a prospective basis. This was an unusual commitment since the standard rule is that regulations are applied retroactively, *see* I.R.C. § 7805(b), *Dixon v. United States*, 381 U.S. 68, 76, 85 S.Ct. 1301, 1306, 14 L.Ed.2d 223 (1965), and that retroactive application is permissible even where the newly promulgated regulation is inconsistent with a previous Treasury publication such as the *Handbook. Adler v. Commissioner*, 330 F.2d 91, 93 (9th Cir.1964). Absent this assurance of prospectivity to taxpayers, therefore, the regulation in question could clearly have been imposed retroactively. *Carpenter v. United States*, 495 F.2d 175, 184 (5th Cir.1974).

John B. Connally, Secretary of the Treasury, in a cover letter to The *Handbook*, stated that it sought to "encourage smaller businesses, which may have had little or no export experience, to export" and to that end was "intended to help businessmen understand and use DISC." Given that the DISC provisions "quickly reach, and rarely leave, a plateau of statutory intricacy seldom rivaled in other sections of the code," B. Bittker & J. Eustice, ¶ 17.14 at 17–43, this unusual promise of prospectivity was doubtless designed to encourage, and did encourage, businesses otherwise wary of retroactive traps in such a complex scheme

to establish DISCs and expand their exports. Without such assurances, full achievement of the congressional goal might have been deferred for some years.

The government argues, citing the reasoning in *CWT Farms, Inc.*, 79 T.C. 1054, that it is free to apply the sixty day regulation retroactively since nothing was expressly stated about commissions receivable in the section entitled "DISC Explained." Indeed, they argue that the express exclusion of commissions from the "export receipts" test in another part of "DISC Explained" creates an inference that commissions receivable do not qualify as export assets at all. However colorable this line of argument may seem as an original proposition, it is inconsistent with the very regulation in question. The regulation as proposed in 1972 and enacted in 1976 simply assumed, without discussion, that commissions receivable were qualified export assets and imposed a sixty day rule for reasons stated *supra*. Moreover, the examples that directly follow the *Handbook's* provisions on accounts receivable contemplate DISCs serving as "commission agent[s]." Finally, we recognize, as did the Court of Claims in *Thomas Int'l. Ltd.*, 6 Cl.Ct. 414 (1984), that the DISC statutory scheme generally contemplates that a commission DISC will be a shell corporation without substantial tangible assets of its own. Thus,

> [i]f a commission DISC ... [was] required to exclude commissions receivable from qualified export assets while including them in total accrued assets, it is problematical how many, if any, of such agents could qualify as DISCs under the 95 percent ... test. [Thus] ... accounts receivable ... must necessarily be understood to include sales in which the DISC is assigned by the producer the role of Commission agent rather than reseller.

at 419. We hold, therefore, that commissions receivable are subject to the *Handbook's* promise of prospective-only modification.

The Commission argues that the publication of the sixty day rule as part of the

regulations proposed in 1972, two years before LeCroy even incorporated its DISC, is an "other publication" sufficient to modify the law and toll the *Handbook*'s promise of prospectivity. However, the operative words in the promise of prospectivity were not "other publications" but "until ... modified." Proposed regulations are suggestions made for comment; they modify nothing. *Barton Mines Corporation v. Commissioner,* 446 F.2d 981, 990 n. 4, 993 n. 7 (2d Cir.1971) (refusing to consider import of proposed regulations in rendering decision). If the Commissioner wanted this regulation to have binding effect, it could have been issued as a temporary regulation, *see* 4 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 110.4.1 at 110–26 (1981) (noting that when taxpayers and revenue agents require immediate guidance, temporary regulations are commonly used by the Service), or proposed with a statement that the sixty day rule was to be exempt from the promise of prospectivity in the *Handbook.* The fortuity that the sixty day requirement was not changed in the period before enactment cannot be used *ex post* to avoid the promise of prospectivity. In fact, other regulations proposed simultaneously with the one in question were frequently modified.

We believe, therefore, that taxpayers in LeCroy's circumstances might reasonably have believed at the pertinent times that accounts receivable were qualified export assets and that the promise regarding prospectivity obviated any need to abide by the proposed regulations. To be sure, in the usual case, safety lies in complying with proposed regulations. However, the *Handbook*'s assurances were deliberately unusual in purporting to offer safety in the *status quo* and were obviously prompted by the need to render the incentives Congress intended to create operable as soon as possible. Under such circumstances, we find the claim that these highly unusual assurances did not apply to proposed regulations to be rather odd. Indeed, the generally retroactive effect of regulations promulgated in the future would appear to be the principal reason why assurances as to prospectivity were necessary.

We further conclude that retroactive application of the regulation in question to LRS is an abuse of discretion. We appreciate that the Commissioner is not a private party subject to common law rules of estoppel. However, it is clear that there are judicially enforceable limits on the Commissioner's discretion to ignore prior assurances given to taxpayers. *Lansons, Inc. v. Commissioner,* 622 F.2d 774, 778 (5th Cir. 1980); *Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 981 (5th Cir.1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978); *Elkins v. Commissioner,* 81 T.C. 669, 677 (1983). We believe the reasons for limiting that discretion in the case of the present regulation are overpowering.

We note, first, that we are not dealing with an informal Treasury statement relating to the interpretation of a particular provision of the Code which is revised after further consideration. Instead, we are confronted with a statement about how the Commissioner will in the future exercise his considerable discretion with regard to retroactive application. Second, we are not dealing with the ordinary case of legislation designed to raise revenue. Instead, we are confronted with provisions of a quasi-regulatory nature by which Congress intended to sacrifice revenue in order to encourage domestic businesses to devote more of their capital and other resources to the export of American-made goods. The provisions in question were thus intended to alter the behavior of firms in certain ways so as to reduce the highly unfavorable balance of payments. The *Handbook* and its promise of prospectivity, issued as an interim guide while the proposed regulations were being considered, played a not insignificant role in bringing about such results by encouraging businesses to act quickly to take advantage of these new provisions without waiting for settled guidance as to their meaning.

To allow the *Handbook*'s promise of prospectivity to be brushed aside in the case of

regulations promulgated after the transactions in question have been completed is harsh and unfair. Businesses that established DISCs had manifold uses to which their capital could have been put with various tax and commercial consequences. Commissions receivable such as those in the instant case come into existence only after an export transaction has taken place. Retroactive application of the regulation in question deprives corporations of DISC status entirely, assumes the underlying commercial transactions would have occurred exactly as they did absent the DISC benefits, and then taxes them accordingly. However, Congress intended to stimulate exports which would not have otherwise occurred, and the retroactive application of regulations in the face of a promise of prospectivity smells of a bushwhack.

However, perhaps the most important reason for holding the Commissioner to the promise in question is to preserve Congress's power to use the tax code for quasi-regulatory purposes. An ongoing power to dishonor deliberately created expectations will deter private parties from seeking to take advantage of proffered tax benefits designed to encourage particular economic activity. To be sure, those who were going to export anyway would have taken their chances, but firms that would have responded only to the extra inducement will discount that inducement by the likelihood that, after the transactions are completed, the Commissioner will seek to withhold the earlier proffered benefit. Numerous regulations were proposed simultaneously with the ones in question. Many were changed before final promulgation. The promise of prospectivity encouraged taxpayers to increase exports by taking advantage of the benefits offered while the Commissioner gave extended consideration to various means of limiting abuses. In the interim, however, the promise eliminated the deterrence created by proposed regulations which might never be promulgated. We must assume that, had it been known at the time of proposal that the promise of prospectivity was not binding, resort to DISC status would have been deterred, as

would the consequent export transactions. Whatever revenue enhancement may occur by allowing retroactive application of this regulation today would thus be at the cost of diminishing Congress's power to use the tax code to create quasi-regulatory incentives tomorrow.

We also believe that retroactive application of this regulation is barred without regard to whether the taxpayer in question actually relied upon the *Handook*'s promise. The prospect of litigation over factual issues such as whether the exports in question would have occurred anyway or whether a particular company relied upon the *Handbook* is almost as much a deterrent to such transactions as the power of the Commissioner to dishonor such promises.

We therefore hold that retroactive application is an abuse of discretion.

Reversed.