*Decisions will be entered under Rule 155.*

ADDISON INTERNATIONAL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6058-82.       Filed June 21, 1988.

*Ernest Getz, Michael D. Horlick, Timothy G. Reaume,* and *Joseph M. Persinger,* for the petitioner.

*Beth L. Williams,* for the respondent.

WRIGHT, *Judge:* By notice of deficiency dated December 15, 1981, respondent determined deficiencies in petitioner's Federal income taxes for the taxable years 1976 and 1977 in the amounts of $1,100,583 and $1,170,603, respectively.

After concessions by the parties, the issues for our decision are (1) whether petitioner Addison International, Inc., failed to qualify as a Domestic International Sales

Corporation (DISC) under sections 991 through 997 during its taxable years 1976 and 1977 and, if so, (2) whether petitioner Addison International, Inc., is properly taxable under section 11 on its taxable income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

Petitioner Addison International, Inc. (AI), was incorporated on September 21, 1973, under the laws of the State of Michigan as a Domestic International Sales Corporation (DISC) pursuant to sections 991 through 997 of the Internal Revenue Code.[1] Since its inception, AI has been the wholly owned subsidiary of Addison Products Co. (APC), a corporation organized and operated under the laws of the State of Michigan. AI's outstanding stock consists of 2,500 shares of common stock with a par value of $1 per share. Both AI and APC use the accrual method of accounting and report taxable income on a calendar year. APC and AI have never filed consolidated returns.

APC manufactures heating and air-conditioning equipment for commercial and residential use. At the time of trial, APC had its primary manufacturing plant in Addison, Michigan, and additional facilities in Michigan and in Texas. Initially, APC sold heating and air-conditioning equipment exclusively in domestic markets. Using the Original Equipment Manufacturing (OEM) method, APC would sell its product to a retailing company which was usually a major manufacturing company with brand-name recognition. In addition to selling its own manufactured products, the retailer would affix its own brand-name to the APC product for sale. Neither the names "Addison" nor "APC" achieved name-brand recognition because the products manufactured by APC did not carry either name. Furthermore, under the OEM method of selling, APC saved costs by not having to maintain a retail or distribution network.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

In the mid-1960's, APC began exporting its products overseas. When it commenced its export operations, APC did not use the OEM method of selling; instead, its products were exported under its own name through the sales management firm of J.D. Marshall International (Marshall). Marshall purchased the products from APC and exported them independently. Although Marshall was not APC's agent, Marshall was granted an exclusive right to sell APC products bearing the Addison name on the retail level in the overseas market. The products proved very marketable and successful, particularly with respect to the sales of air-conditioners in the Middle East.

In 1964 or 1965, APC expanded its export activities and began exporting products under the OEM method. APC sold its products to name-brand retailers who in turn sold the APC products overseas under their own names and labels. Often these export retailers were the same companies or individuals who purchased APC products for domestic resale. Although APC was selling its products to both Marshall and to Marshall's competitors, the name-brand retailers, during this period, there was no conflict because the products prepared for OEM resale were cosmetically and superficially altered to satisfy the retailer's specifications. Under both arrangements, the export of APC products proved highly successful.

In September 1973, as a result of information learned at a seminar, APC organized and incorporated AI as a DISC. On the certificate of incorporation AI's sole purpose was listed as "any activity permitted to be carried on by a Domestic International Sales Corporation." Donald L. Ball (Ball) who was vice president and treasurer for APC during the years in issue, stated that APC's sole reason for incorporating AI was to receive the tax-deferral benefits available to a DISC. According to Ball, there were no additional economic considerations for such action.

On October 1, 1973, APC and AI executed an agreement pursuant to which AI promised that it would conduct its business at all times in such a fashion as to ensure its status as a DISC. In return, APC granted a franchise to AI with respect to all qualified export property sold for use outside of the United States and Puerto Rico. APC agreed to

be responsible for the solicitation and satisfaction of orders. APC agreed to pay AI the maximum amount allowable as a commission, occasionally in advance. Such commissions were to be determined and paid within 8 months of the end of each accounting period.[2]

On November 30, 1973, AI elected DISC status, and APC simultaneously filed its consent to the election. For all taxable years subsequent to this election, including taxable years 1976 and 1977, AI reported income by filing Forms 1120-DISC, the income tax return for DISC's.

Throughout 1976 and 1977, AI maintained a separate bank account at the Detroit Bank & Trust Co. and kept books and records. The books and records consisted of a cash journal, a general journal, and a general ledger. AI had no employees, and maintained no office or facilities separate from those owned by APC. The officers of AI were V.C. Knight (Knight) as president, Ball as vice president and treasurer, Fred W. Freeman (Freeman) as secretary in 1976, and John Coyne (Coyne) as secretary in 1977. The board of directors consisted of Knight, Freeman, and Ball in 1976, and Knight, Coyne, and Ball in 1977. During this period Knight, Coyne, and Ball also served as officers of APC. In all matters relating to the organization and operation of AI, the officers and directors were guided by the "DISC-Handbook for Exporters" (the handbook) which was issued by the Treasury Department in January of 1972. This handbook explained how to handle the affairs of the DISC in such a way as to ensure DISC qualification.

After incorporating AI, APC made no changes in its routine business conduct. APC continued to sell to brand-name retailers and to Marshall. Robert E. Dyas (Dyas), who was vice president of appliance and export sales during the years in issue, explained that after the incorporation of AI, business continued as usual. Indeed, AI had "absolutely no bearing on" the manufacturing department, of which Dyas was in control. AI had no assets and no employees. Except for services relating to qualification, AI performed no services for APC or anyone else, nor did AI request the

---

[2]On Dec. 28, 1979, APC and AI entered into a subsequent franchise agreement which amended certain aspects of the initial franchise agreement. However, the alterations were minor and do not concern the taxable years in issue here.

performance of services from APC or anyone else. AI did not ship goods under its own name and did not issue documents of title or invoices. However, AI's shareholders and officers did hold annual meetings.

During taxable years 1976 and 1977, AI computed income under the methods prescribed by section 1.994-1, Income Tax Regs. These methods relate to the proper allocation of income between related entities. Under the 50/50 method, the price charged by the parent corporation to the DISC for the exported products may be set at a price which allows the DISC to obtain taxable income up to 50 percent of the combined taxable income of the parent corporation and the DISC, plus 10 percent of the export promotion expenses. The 4-percent method allows the parent corporation to set the price charged to the DISC for the exported products at 4 percent of the qualified export receipts plus 10 percent of the export promotion expenses incurred by the DISC. Petitioner's income for taxable year 1976 was computed in accordance with section 1.994-1(a), Income Tax Regs., by using the 50/50 method, resulting in income in the amount of $2,185,016, and in conjunction with the 4-percent method, resulting in income in the amount of $4,730, for total commission income of $2,189,746. Income for taxable year 1977 was computed using these same two formulas, resulting in income in the amount of $2,313,141, under the 50/50 method, and resulting in income in the amount of $594 under the 4-percent method, for total commission income of $2,313,146. In addition to the commission income reported for taxable years 1976 and 1977, AI reported interest income derived from a producer's loan in the amounts of $108,591 and $125,626, respectively. After deducting expenses in the amounts of $5,456 in 1976 and $10 in 1977, AI reported taxable income for the years in issue in the amounts of $2,292,881 and $2,438,757, respectively.

Although APC claimed commission expense deductions attributable to commissions payable to AI for taxable years 1976 and 1977 in the amounts of $2,189,746 and $2,313,141, respectively, the money was not actually paid by the close of AI's taxable year. On October 19, 1977, APC issued a check to AI in payment of the commission owing for the taxable year 1976. The payment was made at this time

because it was APC's practice to pay AI at or about the time the DISC tax returns were filed.[3] The next day, AI made a producer's loan to APC in the amount of $1,141,400.[4] The remainder of the commission payment, in the amount of $1,048,346, was distributed by AI to APC as previously taxed income. On March 21, 1978, APC issued a check in the amount of $2,324,840 to AI in payment of the commissions and interest owing for the taxable year 1977. Of this amount, AI made an advance payment for a producer's loan to APC in the amount of $979,112, and made a distribution of the remainder to APC in the amount of $1,345,728. AI's only other expenditures for taxable years 1976 and 1977 were payments for Michigan franchise taxes in the amounts of $5,456 and $10, respectively.

In March 1978, independent auditors informed APC's officers and directors that they had failed to follow one of the procedures required to qualify AI as a DISC. Specifically, the memorandum advised that sections 1.993-2(d)(2) and 1.994-1(e)(3), Income Tax Regs., were no longer in proposed form but had been promulgated in final form. In brief, those regulations required, among other things, that the commission payment made by a related supplier to a DISC had to be paid within the 60 days following the close of the DISC's taxable year (the 60-day payment rule).[5] The 60-day payment rule was not included in the handbook. Immediately upon learning of the change, APC made the required payments on March 21, 1978. On September 6, 1978, the officers and directors of APC received an internal memorandum from their management consultant which confirmed the warning APC had received from independent auditors.

The statute of limitations with respect to APC was extended for the taxable years 1976 and 1977 to June 30, 1982, pursuant to written agreement. The statute of limitations with respect to APC for taxable years 1976 and 1977

---

[3]Under sec. 6072(b), a DISC's tax return is due on or before the 15th day of the ninth month following the close of its taxable year.

[4]The parties have stipulated that the producer's loan of Oct. 20, 1977, was not, in its entirety, a qualified producer's loan. Of that amount, only $634,299 was a qualified producer's loan, and the balance, in the amount of $507,101, did not qualify as a producer's loan.

[5]Oct. 19, 1977, the actual date of the commission payment for the taxable year 1976, was more than 7 months after the date when payment should have been made in order to comply with the 60-day payment rule. The due date was Mar. 1, 1977. When APC made the payment, it included a portion labeled "interest accruing" for this 7-month extension.

expired at midnight on June 30, 1982. Respondent issued a timely notice of deficiency to AI for taxable years 1976 and 1977 on December 15, 1981.

## OPINION

In his notice of deficiency to AI, respondent determined that the commissions receivable reported by AI in the taxable years 1976 and 1977 did not constitute qualified export assets because those amounts had not been paid by APC to AI within 60 days after the close of each taxable year. Respondent therefore determined that AI did not qualify as a DISC under section 992 in, the taxable years 1976 and 1977. Respondent allocated the income and expenses to AI, itself, rather than to APC.

Petitioner contends that the regulations containing the 60-day payment rule are invalid but that, if they are valid, retroactive application of the regulations in this case would be improper. In the alternative, petitioner argues that it substantially complied with the regulations. With respect to the second issue for our consideration, petitioner contends that if AI is not qualified as a DISC for the taxable years 1976 and 1977 then the taxable income is properly taxable to APC rather than AI. Petitioner bears the burden of proof on all issues. *Welch v. Helvering,* 290 U.S. 111, 115 (1933); Rule 142(a).

The DISC provisions were enacted by Congress in 1971[6] to provide tax deferral for that portion of income earned by U.S. corporations from the sale or lease of domestic products to foreign buyers and lessees. Generally, a corporation that qualifies as a DISC is not taxable on its profits. Secs. 991 and 995(a). Approximately half of the profits is taxed as a constructive distribution to the shareholders, whether or not such distribution actually occurs, while taxation on the remaining half is deferred. Sec. 995(b); *Westinghouse Electric Corp. v. Tully,* 466 U.S. 388, 391-392 (1984); *Gehl Co. v. Commissioner,* 795 F.2d 1324, 1327 (7th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court. Any distributions that are made by the DISC to its shareholders out of previously untaxed

---

[6]Secs. 501-507 of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497, 535-553.

earnings and profits are taxable to the shareholders under sections 301 and 316. The retained earnings and profits of a DISC that are not taxed currently remain exempt from taxation until they are actually distributed to the shareholders, until a shareholder disposes of his DISC stock in a taxable transaction, or until the corporation ceases to qualify as a DISC. Secs. 996(a)(1), 995(c), and 995(b)(2). Subject to certain restrictions, a DISC is allowed to transfer additional funds to its shareholders in the form of a "producer's loan."

In order to qualify as a DISC, at least 95 percent of the adjusted basis of all assets of the corporation, measured on the last day of the taxable year, must be qualified export assets. Sec. 992(a)(1)(B); *Goldberger, Inc. v. Commissioner,* 88 T.C. 1532, 1542 (1987). The term "qualified export asset," as defined in section 993(b), includes accounts receivables. Sections 1.993-2(a)(3) and 1.993-2(d)(2), Income Tax Regs., provide generally that a DISC's accounts receivable will be qualified export assets if the receivables arise as commissions earned by a commission DISC.[7] Where, however, the domestic parent corporation of the commission DISC is a "related supplier" of the DISC, the circumstances under which commissions receivable are treated as qualifying export assets are restricted by the regulations. A related supplier is a person or corporation who is owned or controlled by the same parties who own or control the DISC and who deals individually with the DISC in a transaction which is controlled by section 994. The purview of section 994 includes a transaction in which the DISC is a commission agent for the related supplier on sales of export property to third parties such as the transactions between APC and AI. Sec. 1.994-1(a)(3) and (b)(1), Income Tax Regs. In such a case, the amount of commissions receivable that qualify as qualified export assets for each tax year must be paid by the parent corporation to the DISC within 60 days after the close of the DISC's taxable year. Sec. 1.994-1(e)(3)(i), Income Tax Regs.[8]

---

[7]The parties agree that AI is a commission DISC rather than a buy-sell DISC.

[8]The pertinent provisions of sec. 1.993-2(d)(2), Income Tax Regs., provide:

(2) *Trade receivables representing commissions.* If a DISC acts as commission agent for a principal in a transaction * * * which results in qualified export receipts for the DISC, and if an account receivable or evidence of indebtedness held by the DISC and representing the

Since APC was a related supplier with respect to AI, AI's commissions receivable from APC had to be paid within 60 days following the close of AI's taxable year in order for such commissions receivable to constitute trade receivables and, accordingly, qualified export assets, under section 1.993-2(d)(2), Income Tax Regs. It is undisputed that APC did not, in fact, pay the commissions it owed to AI within the 60 days following the close of AI's taxable years 1976 and 1977, and that therefore, under the unambiguous language of the regulations, the commissions owed for the taxable years 1976 and 1977 do not constitute qualified export assets. Therefore, if the commissions in issue are not qualified export assets, AI was not qualfied as a DISC in 1976 and 1977 because less than 95 percent of the basis of its total assets was attributable to qualified export assets.

Petitioner first argues that the regulations imposing the 60-day payment rules are invalid. Petitioner maintains that the regulations are interpretive, rather than legislative regulations, and, as such, they exceed the scope of the Secretary's authority under section 7805. This very question has been considered on several prior occasions and the regulations have consistently been upheld as representing a proper exercise of the Secretary's authority. *Gehl Co. v. Commissioner, supra; CWT Farms, Inc. v. Commissioner,* 755 F.2d 790 (11th Cir. 1985), affg. 79 T.C. 1054 (1982); *LeCroy Research Systems Corp. v. Commissioner,* 751 F.2d 123 (2d Cir. 1984), revg. on other grounds T.C. Memo. 1984-145; *Thomas International Ltd. v. United States,* 773 F.2d 300 (Fed. Cir. 1985). Because this point is well settled, we will not exhume it today.

Petitioner next contends that, even if the regulations which contain the 60-day payment rules are valid, the regulations may not be retroactively applied to it. Section

commission payable to the DISC as a result of the transaction arises * * * such account receivable or evidence of indetedness shall be treated as a trade receivable. If, however, the principal is a related supplier (as definded in section 1.994-1(a)(3)) with respect to the DISC, such account receivable of evidence of indebtedness will not be treated as a trade receivable unless it is payable and paid in a time and manner which satisfy the requirements of section 1.994-1(e)(3) * * *

Sec. 1.994-1(e)(3)(i), Income Tax Regs., provides in pertinent part:

(i) The amount * * * a sales commission (or reasonable estimate thereof) actually charged by a DISC to a related supplier * * * must be paid no later than 60 days following the close of the taxable year of the DISC during which the transaction occurred.

1.994-1(e)(3), Income Tax Regs., which contained the 60-day payment rule, was proposed on September 21, 1972, and promulgated in final form on September 29, 1976. Section 1.993-2(d)(2), Income Tax Regs., which applied the 60-day payment rule to the accounts receivable of commission DISC's, was proposed on October 4, 1972, and promulgated in final form on October 14, 1977. APC's commission payment to AI for the taxable year 1976 occurred on October 19, 1977, just 5 days after the regulations were promulgated in final form. Although the officers and directors of APC were aware that the regulations existed in proposed form, they did not know that the regulations had been promulgated in final form until nearly 6 months later, in March of 1978. At that time, APC made the commission payment owing to AI for the taxable year 1977. The 60-day-payment rule was not mentioned in the handbook.[9]

Petitioner argues that because it relied on promises contained in the handbook, the regulations cannot, in fairness, be retroactively applied to it. Specifically, petitioner relied on the section of the handbook which stated that "The Internal Revenue Service will follow the rules and procedures set forth in this part until such time as they may be modified in regulations or other Treasury publications. Any such modifications which may be adverse to taxpayers will apply prospectively only." "DISC: A Handbook for Exporters," U.S. Department of the Treasury, January 1972, at 10. Because the handbook clearly promised that adverse treatment would not be retroactively applied, petitioner maintains that its reliance on the handbook immunizes it from retroactive application.

We may quickly dispense with petitioner's argument with respect to taxable year 1977. Both regulations had been fully promulgated in final form by October 14, 1977, but APC's payment to petitioner did not occur until March 28, 1978. As a calendar year taxpayer, petitioner's taxable year ended December 31, 1977. AI should have made the payment by March 1, 1978, in order to comply with the 60-day payment rule contained in the regulations. Surely

---

[9]Where taxpayers rely on a plausible interpretation of the plain meaning of settled law "We see no reason to add to this burden by requiring them anticipatorily to interpret ambiguities in respondent's rulings to conform to his subsequent clarifications." *Corn Belt Hatcheries of Arkansas, Inc. v. Commissioner,* 52 T.C. 636, 639 (1969).

petitioner did not believe that the regulations, once fully and finally promulgated, would not have prospective application. Although the evidence shows that petitioner was unaware of the final promulgation, petitioner would have us allow it immunity against the effect of the regulations until such time as it actually learned of their promulgation in final form. This we cannot do, and find petitioner's argument concerning the retroactive application of the regulations with respect to taxable year 1977, unfounded.

With respect to the retroactive application of the 60-day-payment rule for taxable year 1976, petitioner has raised a question which has caused disagreement among the Circuit Courts of Appeals. In *CWT Farms, Inc. v. Commissioner, supra*, the U.S. Court of Appeals for the 11th Circuit considered a DISC whose parent corporation had failed to pay the commissions owing within the 60-day period. In that case, the parent had relied on the handbook and argued that retroactive application would be unfair. The 11th Circuit held that Government publications do not bind the Commissioner regardless of the promises they contain. Because the regulations existed in proposed form, the taxpayer's wisest course would have been to comply with the regulations' requirements even before their enactment in final form.

In contrast, the U.S. Court of Appeals for the Second Circuit held, in a factually similar case, that the regulations could not be retroactively applied. *LeCroy Research Systems Corp. v. Commissioner, supra*. According to the Second Circuit, the very nature of the DISC provisions, which attempted to induce export activity by promises of tax benefits, purposefully elicited taxpayer reliance. Therefore, it was an abuse of discretion for the Secretary to ignore such promises when they succeeded in eliciting the desired behavior. The Second Circuit held that the taxpayers were entitled to rely on the promises contained in the handbook.

In *Gehl Co. v. Commissioner, supra*, the U.S. Court of Appeals for the Seventh Circuit agreed with the Second Circuit. The Seventh Circuit noted that the appropriate test is (1) whether the taxpayer had justifiably relied on settled law that is altered by the regulations, and (2) whether the

retroactive application of the regulations would create "an inordinately harsh result." 795 F.2d 1332. The court held that because the handbook made express promises and was designed to elicit certain behavior from the taxpayer, it was an abuse of discretion to attempt to renege on the promises contained in the handbook.

This Court has not directly addressed this question since the controversy arose in the Circuit Courts of Appeals. In *Gibbons International, Inc. v. Commissioner*, 89 T.C. 1156 (1987), we upheld the validity of the regulations in question but did not pass on the question of retroactive application because the tax years in issue occurred subsequent to the enactment of the regulations in final form.[10]

In considering the arguments with respect to the retroactive application of sections 1.993-2(d)(3) and 1.994-1(e)(3), Income Tax Regs., we initially note that our decision should have limited impact. The tax years in question must, by definition, precede 1978, because the regulations became final on October 14, 1977. Commencing with the tax year 1978, all taxpayers were responsible for complying with the enacted regulations.

The Seventh Circuit and the Second Circuit both base their decisions to deny retroactive application on the narrow grounds of the singular and unusual nature of the DISC. Because the entire purpose of the DISC legislation was to entice taxpayers into following a path of behavior which satisfied the congressional objective of increasing U.S. exports, taxpayer compliance with the handbook implicitly served congressional objectives. The handbook promised the taxpayers that any modifications would be prospective, and many taxpayers relied on that. As the Seventh Circuit noted, regulations are subject to change, even substantial change, prior to final promulgation. Strict compliance with proposed regulations could cause extra time and labor if the proposed regulations undergo substantial modification upon final promulgation. In the uncharted sea of structuring and operating a DISC, taxpayers who followed the guidelines in the handbook were adhering to the most reliable informa-

---

[10]In *Fritzsche Dodge & Olcott, Inc. v. Commissioner*, T.C. Memo. 1983-56, 45 T.C.M. 607, 52 P-H Memo T.C. par. 83,056 (1983), we followed the precedent established prior to the recent disagreement among the circuits, citing to our opinion in *CWT Farms, Inc. v. Commissioner*, 79 T.C. 1054 (1982), affd. 755 F.2d 790 (11th Cir. 1985).

tion available. Because the DISC is a creature of statutory artifice, a taxpayer would have no independent reasons for any actions taken with respect to the organization and operation of a DISC. Thus, we conclude that the positions taken by the Second and the Seventh Circuits are well founded. When sections of the Internal Revenue Code are designed to invoke taxpayers to follow a course of behavior for which they have no other motives, respondent cannot, in fairness, complain when the desired compliance is forthcoming and the taxpayers take the Commissioner at his word.

Petitioner did not maintain that the commission payment made by APC to AI on October 19, 1977, was motivated by the discovery that the regulations had been promulgated in final form. Although payment was made within 5 days of the promulgation, the timing was purely coincidental. Nonetheless, even if petitioner had been aware of the final promulgation of the regulations, it would not have expected that they affected it, because it believed it was protected according to the promises contained in the handbook. While we cannot condone willful ignorance, we conclude that petitioner's failure to comply with the 60-day payment rule stemmed from its reliance on the handbook. Accordingly, sections 1.993-2(d)(3) and 1.994-1(e)(3), Income Tax Regs., may not be retroactively applied to petitioner for taxable year 1976.

Petitioner's next argument is that the payments, although late, were sufficiently timely to constitute substantial compliance with the regulations in issue. This argument has been considered and rejected on several occasions. *Gehl Co. v. Commissioner, supra* at 1331; *Thomas International Ltd. v. United States, supra* at 305.[11] Because the regulations in this case are substantive rather than procedural, compliance must be strict and total. *Tipps v. Commissioner,* 74 T.C. 458, 468 (1980). Petitioner's position that substantial compliance with sections 1.993-2(d)(3) and 1.994-1(e)(3), Income Tax Regs., will suffice, is without merit.

The second issue for our consideration is whether AI is properly taxable on the income which results from AI's disqualification as a DISC in taxable year 1977. In his notice

---

[11] See also *Fritzsche Dodge & Olcott, Inc. v. Commissioner, supra,* 45 T.C.M. at 609-610, 52 P-H Memo T.C. par. 83,056, at 83-163—83-164.

of deficiency to AI, respondent determined that AI did not qualify as a DISC under section 992 for the taxable years 1976 and 1977. Respondent allocated the income and expenses to AI rather than to APC.

Although neither party discussed this issue extensively on brief, it appears that the statutory notice of deficiency was sent to AI, alone, and APC did not receive a notice of deficiency. Furthermore, with respect to APC, the statute of limitations has run and respondent is precluded from sending a notice of deficiency to APC. Respondent urges us to hold AI liable for the deficiency which results from its disqualification.

Petitioner argues that, if AI is disqualified as a DISC, then AI's current income should be taxed to APC rather than AI. In support of this position, petitioner stresses the total absence of economic purpose or activity behind AI's incorporation and operation. Although income was entered on AI's books and reported on AI's DISC income tax returns, petitioner maintains that this was done purely to comply with the directives of the DISC legislation. Petitioner also contends that the assignment of income doctrine, articulated in *Lucas v. Earl*, 281 U.S. 111 (1930), precludes taxing AI, a mere paper corporation.[12]

Petitioner argues that the principles of *Lucas v. Earl*, *supra*, and subsequent cases, require that the income which was attributed to AI, but which was, in fact, earned by APC, be taxed to APC. Petitioner contends that after incorporating AI, APC made no significant changes in procedure or personnel. Manufacturing, marketing, and sales operations were conducted exactly as they had been prior to AI's incorporation. Although the organization and operation of the DISC necessitated some bookkeeping and accounting modifications, there were no substantive economic or business practice changes. Furthermore, in organizing and incorporating AI, APC merely followed the dictates of the Internal Revenue Code or the handbook. Beyond the steps necessary to incorporate and qualify AI, AI engaged in no

[12]Respondent maintains that sec. 482 is a tool which only he may wield, but this argument is misplaced because petitioner urges us to consider the source of AI's income under the case law doctrine of assignment of income rather than under the statutory authority of sec. 482. *This opinion was reviewed by the Court prior to Chief Judge Sterrett's resignation from the Court.

other activity. Petitioner argues that none of those steps was motivated by an independent business purpose, and none of them constitutes business activity within the meaning of *Moline Properties, Inc v. Commissioner,* 319 U.S. 436 (1943). See *Noonan v. Commissioner,* 52 T.C. 907 (1969), affd. 451 F.2d 992 (9th Cir. 1971); *Aldon Homes, Inc. v. Commissioner,* 33 T.C. 582 (1959).

Respondent counters that AI earned the income which was attributed to it on its books and ledgers. Respondent also argues that petitioner chose the corporate form and should be bound by that election. Because petitioner elected the DISC form, respondent maintains, all of AI's activities were imbued with that business purpose and thus cannot be disregarded under *Moline Properties, Inc. v. Commissioner, supra.* Respondent further suggests that AI conducted sufficient business activity to satisfy the minimal-business-activity test of *Moline Properties.*

In the abstract, petitioner's argument is not without appeal. A DISC such as AI does not generate the income which it enters on its books. As is noted in the regulations under section 992, a DISC might not be recognized as a corporation for tax purposes if it were not a DISC. Sec. 1.992-1(a), Income Tax Regs. Nonetheless, if we were to hold as petitioner requests we would, in effect, be calling a DISC a sham corporation, and this we cannot do. Congress created the DISC to implement certain objectives and we cannot undermine the statutory purpose. Rather, we must look to the regulations and the legislative history to determine how to treat the current income of a disqualified DISC.

The regulations distinguish between three different types of DISC income. A DISC can have "previously taxed income," "accumulated income," and "other earnings and profits." Sec. 1.996-3(a), Income Tax Regs. Generally, accumulated income is taxed when actually distributed to shareholders while previously taxed income is taxed at the time it is deemed to have been distributed at the close of the DISC's taxable year. Other earnings and profits are defined only as being income which falls into neither of the other two categories. Sec. 1.996-3(d), Income Tax Regs.

Upon disqualification, the DISC becomes a "former DISC." A DISC remains a former DISC for 5 years based on its original election, but if it fails to requalify as a DISC by the end of that 5-year period, the election expires. Section 995 provides that upon disqualification, either by revoking the election or by failing to satisfy one of the many qualifying conditions, the former DISC's accumulated income, which it continues to hold, is taxable to the DISC's shareholders. Sec. 995(b)(2)(A). The accumulated income is distributed to the shareholders over a period of up to 10 years. Sec. 1.995-3(b), Income Tax Regs. The shareholders are not taxed on receipt of the previously taxed income when it is distributed.

The proper tax treatment of the third category of DISC income, other earnings and profits, is less clear. Especially with respect to income received by a DISC which is subject to a valid DISC election but which has been disqualified, an initial analysis indicates that the underlying benefit accorded to DISC's and their shareholders is the deferral of the income which is ultimately taxable to the shareholders. Thus, at first blush it seems that disqualification would eliminate the benefit, ending deferral and making the shareholder immediately taxable on the DISC's current earnings.

However, the legislative history contains a brief reference which indicates that congressional intent dictates an opposite conclusion. Although other earnings and profits would appear to be generally comprised of income earned prior to DISC qualification, the Senate Finance Committee report noted that:

The third division of a DISC's earnings and profits, is referred to as "other earnings and profits." This has reference to those earnings and profits of a DISC which were accumulated while the corporation was not taxed as a DISC (i.e., in a year prior to the corporation's election, or subsequent to the election if it did not qualify for the year). These are the "normal" earnings and profits of a DISC which are the same as the earnings and profits of an ordinary corporation which never was a DISC. As a result, these earnings and profits when distributed are eligible for the dividends received deduction and are not treated as foreign source income. [S. Rept. 92-437, at 122-123 (1972), 1972-1 C.B. 559, 628.]

Thus, the legislative history indicates that the disqualified DISC was meant to be taxed as a separate corporation within the meaning of subchapter C on any income which

was neither previously taxed income nor accumulated income. Although this aspect of Congress' framework for DISC taxation does not appear in the statute or the regulations, we shall accord it the proper weight. See *Burnet v. S. & L. Building Corp.*, 288 U.S. 406 (1933). Thus, we conclude that the current income of a disqualified DISC which is subject to a valid DISC election, is taxable to the DISC itself and the dividends, when paid to the shareholders, qualify for the dividends received deduction.

Accordingly, we find that the notice of deficiency was properly sent to the proper taxpayer, AI, and that AI is liable for the deficiency determined with respect to taxable year 1977 only.

To reflect the foregoing,

> *Decision will be entered for the respondent with respect to taxable year 1977.*
>
> *Decision will be entered for the petitioner with respect to taxable year 1976.*

Reviewed by the Court.

STERRETT,* NIMS, PARKER, SHIELDS, COHEN, SWIFT, JACOBS, PARR, WILLIAMS, and WELLS, *JJ.*, agree with the majority opinion.

WHALEN, *J.*, dissents.

---

GERBER, *J.*, dissenting: The majority has overruled our recent and well-reasoned opinion in *CWT Farms, Inc. v. Commissioner*, 79 T.C. 1054 (1982), which was embraced and affirmed by the Court of Appeals for the 11th Circuit at 755 F.2d 790 (11th Cir. 1985). I respectfully dissent because the majority has not provided adequate rationale in support of its decision to overrule our established and affirmed precedent. Also, the majority has ignored long-established principles concerning the retroactive application of regulations.

All courts which have considered the final regulations in question have found them to be valid and "consistent with

---

*This opinion was reviewed by the Court prior to Chief Judge Sterrett's resignation from the Court.

the statutes' origin and purpose." *CWT Farms, Inc. v. Commissioner,* 755 F.2d 790, 797-802 (11th Cir. 1985), affg. 79 T.C. 1054, 1061-1067 (1982); *Gehl Co. v. Commissioner,* 795 F.2d 1324, 1327 (7th Cir. 1986); *LeCroy Research Systems Corp. v. Commissioner,* 751 F.2d 123 (2d Cir. 1984); *Thomas International Ltd. v. United States,* 773 F.2d 300 (Fed. Cir. 1985). The Courts of Appeals for both the Second and Seventh Circuits have decided that the regulations should not be retroactively applied, whereas this Court and Court of Appeals for the 11th Circuit have held otherwise.

Judge Simpson, in his thorough analysis of the retroactivity of regulations, set forth the following three principles (each of which was, at the very least, supported by a Supreme Court citation), as follows: (1) "Internal Revenue regulations are retroactive in effect unless the Commissioner provides otherwise." (2) "The Commissioner's failure to make regulations nonretroactive may not be disturbed unless it amounts to an abuse of discretion." (3) "An abuse of discretion may be found if the retroactive regulations alter settled prior law or policy upon which the taxpayer justifiably relied and if the change causes the taxpayer to suffer inordinate harm." *CWT Farms, Inc. v. Commissioner,* 79 T.C. at 1068.

Our Court and the Court of Appeals for the 11th Circuit considered two bases in deciding whether the situation involved herein presented an exception to the general rule that regulations are to be retroactively applied. First considered was the principle that statements contained in publications, such as the handbook in question, do not bind the Commissioner in subsequent litigation. See cases cited at 79 T.C. 1069. Although that general principle is appropriate in most circumstances, one might reasonably argue that the handbook in question had a more significant stature or that it was in other ways extraordinary.[1]

The second basis presents a more persuasive rationale for finding that the general rule of regulation retroactivity should apply. The handbook containing the guidelines or,

---

[1]Although one might make that argument, it is a matter of judgment and would appear to be a close call. In this regard, we have already taken a position on this aspect in *CWT Farms, Inc. v. Commissioner,* 79 T.C. 1054 (1982), and numerous Memorandum Opinions. In close situations, such as this one, we have a duty of consistency and should not change our opinion or judgment unless it is clearly wrong.

lack of same, was published and issued by the Treasury Department during January 1972. "The handbook provided that its rules would be followed until modified 'in regulations or other Treasury publications.' " *CWT Farms, Inc. v. Commissioner,* 79 T.C. at 1069. The Treasury Department published and issued proposed regulations containing the disputed requirements during October 1972. The petitioner in this case did not rely upon the handbook or proposed regulations or apparently consider DISC status until "September 1973, as a result of information learned at a seminar." The final regulations were adopted in final form on September 29, 1976, and October 14, 1977. The dates of the final regulations were both before the commission payment in question occurred and at least one of the final regulations was adopted before petitioner's income tax return for the period in question was due to be filed.

In our finding that petitioner in *CWT Farms, Inc., v. Commissioner,* failed to demonstrate that respondent abused his discretion in applying the subject regulations retroactively, the following reasoning and principles, amply supported by precedent, were provided: (1) Respondent's regulatory interpretation did not alter settled prior law and taxpayers had no " 'vested interest in a hypothetical decision in * * * [their] favor prior to the advent of the regulations.' *CWT Farms, Inc. v. Commissioner,* 79 T.C. at 1070; *Helvering v. Reynolds,* 313 U.S. at 433; *Chock Full O'Nuts Corp. v. United States,* 453 F.2d at 303." (2) The respondent made his position publicly known in proposed regulations during 1972, and that constituted adequate notice. See *Wendland v. Commissioner,* 79 T.C. 355, 382 n. 15 (1982). (3) A published proposed regulation, at very least, complied with the terms for modification or variance from the terms (or lack thereof) of the handbook. *CWT Farms, Inc. v. Commissioner,* 79 T.C. at 1069-1070.

Our reasoning in support of retroactive application in *CWT Farms, Inc. v. Commissioner,* is equally appropriate here, where petitioner did not consider use of a DISC until after issuance of both the handbook and proposed regulations. In light of the respondent's published intent, petitioner was taking a risk in blindly following the handbook. Moreover, it appears that the handbook was not dispositive

or in any way concise about the circumstances covered in the proposed or final regulations. Most importantly, the majority does not set forth any changed conditions or law to justify overruling our established and affirmed precedent in *CWT Farms, Inc. v. Commissioner.*

The opinions of the Courts of Appeals for the Second and Seventh Circuits which overruled memorandum opinions of this Court and supported a position contrary to the Court of Appeals for the 11th Circuit and this Court, essentially, offered the following reasoning: (1) That the handbook in question was something more than a statement of current law, because it contained promises to be relied upon in the future; and (2) that proposed regulations are merely "suggestions made for comment" and are not intended to modify anything. *Gehl Co. v. Commissioner,* 795 F.2d 1324 (7th Cir. 1986); *LeCroy Research Systems Corp. v. Commissioner,* 751 F.2d 123 (2d Cir. 1984).

Although I agree that proposed regulations do not have the authority or standing of temporary or final regulations, they are regularly used to present the Treasury Department's position on a particular subject. The purpose for issuing proposed regulations is to put taxpayers on notice and to elicit commentary that may be considered in finalizing the regulation. See sec. 601.601(a) and (b), Procedural Regs. As jurists, we have adhered to the principle that respondent's revenue rulings and procedures are nothing more than the position of a party and they are afforded little or no weight as authority. *Estate of Lang v. Commissioner,* 613 F.2d 770, 776 (9th Cir. 1980), affg. on this point 64 T.C. 404 (1975); *Stubbs, Overbeck & Assoc. v. United States,* 445 F.2d 1142 (5th Cir. 1971); *Sims v. United States,* 252 F.2d 434 (4th Cir. 1958), affd. 359 U.S. 108 (1959); *Minnis v. Commissioner,* 71 T.C. 1049, 1057 (1979). The opinions of the Courts of Appeals for the Second and Seventh Circuits have placed proposed regulations below the level afforded revenue rulings and procedures and placed the handbook in the same status as temporary or final regulations. This approach is both divisive and disruptive to a long-established order of significance upon which both taxpayers and Government have long relied.

To reiterate, in effect, the Government made no promises to this petitioner or any taxpayer with a taxable year after 1972. The handbook and proposed regulations were published within 9 months of each other during 1972. I find the majority's position that a proposed regulation is insufficient to put the public on notice to be simply incorrect.

For the foregoing reasons, I respectfully dissent from the majority's opinion.

---

RUWE, *J.*, dissenting: For the following reasons, I do not agree with the majority's holding that petitioner, a former DISC, was the proper taxpayer with respect to income attributed to it for the year 1977.

The majority opinion is based on a concern that were we to find petitioner totally lacking in substance, this "would, in effect, be calling a DISC a sham corporation" and thus undermine the purpose of the DISC legislation. Majority opinion at p. 1221. We need not be concerned with undermining the purpose of the DISC legislation in this case for the simple reason that petitioner was not a DISC during 1977.

The majority opinion implies that even though petitioner was disqualified, it was still a DISC for some purposes. Sec. 992(a)(1) defines a DISC. Petitioner failed to meet the qualifications for DISC status which are contained in section 992(a)(1)(B) and section 993(b) and the regulations thereunder. This is undisputed. Section 992(a)(3) defines a "former DISC" as "with respect to any taxable year, a corporation *which is not a DISC for such year* but was a DISC in a preceding taxable year." (Emphasis added.) Section 1.992-1(e), Income Tax Regs., states that "A corporation is a DISC for a taxable year *only* if such an election is in effect for that year *and* the corporation also satisfies the requirements of paragraphs (a) through (d) of this section." (Emphasis added.) The majority opinion has already found that petitioner failed the test contained in section 1.992-1(c), Income Tax Regs., which is the same requirement set forth in section 992(a)(1)(B).

It is true that once having made an election to be treated as a DISC, a corporation that fails to qualify as a DISC for a particular year will be considered as a DISC for subsequent years in which it meets DISC qualifications. There is no need to make another election. See sec. 1.992-2(d), Income Tax Regs. However, the benefits of tax deferral available through the DISC arrangement are simply unavailable for export transactions occurring during a year when the former DISC is disqualified. Arrangements related to foreign sales transactions during a year when a former DISC is not qualified should be judged using the same criteria that we would use in judging the substance of any other corporate transactions.[1]

The DISC legislative history quoted on page 1222 of the majority opinion is consistent with the above analysis. It is unquestioned that a corporate entity that is a DISC or former DISC can have " 'normal' earnings and profits * * * which are the same as the earnings and profits of an ordinary corporation which never was a DISC." S. Rept. 92-437, at 123 (1972), 1972-1 C.B. 559, 628. There is nothing, however, in this legislative history indicating that when a former DISC ostensibly earns "normal" profits, that the bona fides of its corporate activities should be judged on standards other than those applied to other corporations which are not DISC's. The legislative history describes as "normal" those earnings and profits generated before the corporation became a DISC and those generated during a period when it was disqualified as a DISC. S. Rept. 92-437, *supra*, 1972-1 C.B. at 628. It seems beyond question that corporate activities preceding initial DISC election and qualification would be judged on the basis of business purpose and economic substance without any regard to the DISC provisions. Since the legislative history equates pre-DISC earnings with earnings during a disqualification period, why would we use DISC concepts in judging the latter and not the former? The DISC provisions simply don't apply in making that judgment.

[1] Sec. 1.992-2(d) also indicates that a "former DISC" is subject to the DISC provisions of the Code. This is necessary only because prior accumulations of earnings and profits earned while qualified as a DISC must be accounted for. S. Rept. 92-437, at 93 (1972), 1972-1 C.B. 559, 611. It does not and cannot be meant to attribute all DISC corporate attributes to a former DISC. To do so would render the qualification requirements meaningless.

Having eliminated the problem of potentially undermining the DISC statutory framework, this transaction should be judged on the basis of the facts presented. Petitioner contends that, in reality, it had no income because it did nothing to earn the income. Indeed, it could not have done anything based upon the findings of fact since it had no employees, performed no services, dealt with no customers, and did not even receive the payment of the amounts of income, which respondent argues it earned, until the following year.[2]

Normally, the choice of doing business in corporate form will be respected.

Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, *so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation,* the corporation remains a separate taxable entity. * * * [*Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 438-439 (1943). Emphasis added.]

However, tax avoidance, standing alone, is not sufficient to meet the business purpose test in *Moline Properties* and the fact finding in this case indicates clearly that there was no other business purpose and no business activity. See *National Carbide Corp. v. Commissioner,* 336 U.S. 422 (1949); *Noonan v. Commissioner,* 52 T.C. 907 (1969), affd. 451 F.2d 992 (9th Cir. 1971); *Aldon Homes, Inc. v. Commissioner,* 33 T.C. 582 (1959). The only thing that petitioner did that might be construed as corporate activity was to maintain a bank account and separate records, and act as a conduit regarding funds of APC.[3] These are minimum DISC requirements. See sec. 1.992-1(a)(1) through

---

[2]Even the amount which petitioner received in March 1978, ostensibly due to commissions earned in 1977, was immediately paid back to APC in the form of an advance payment on a producer's loan and a distribution of previously taxed income on the assumption that petitioner qualified as a DISC. Since these characterizations of amounts petitioner paid back to APC depend on petitioner's DISC qualification, they must be disregarded. It is then clear that petitioner was merely a conduit.

[3]The majority suggests that because petitioner maintained a bank account, kept books and records, and held annual meetings, it must be recognized as a corporation for Federal income tax purposes under *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943). I disagree. This Court has held that, although an entity has engaged in similar activities, it would not be recognized as a corporation for tax purposes where it lacked a substantial business purpose for organization and had not engaged in any substantive business activities. See *Aldon Homes, Inc. v. Commissioner,* 33 T.C. 582 (1959). See also *Visnapuu v. Commissioner,* T.C. Memo. 1987-354; *Horn v. Commissioner,* T.C. Memo. 1982-741.

(8). Even respondent's own regulations explicitly recognize that DISC qualification (which requires incorporation, books and records, a bank account, and payments) entitles a corporation to be recognized for tax purposes "even though such corporation would not be treated (if it were not a DISC) as a corporate entity for Federal income tax purposes." Sec. 1.992-1(a), Income Tax Regs. One can hardly imagine a corporate entity more devoid of substance than petitioner during the year 1977.

Having failed to qualify as a DISC, the only purpose for petitioner's existence, i.e., tax deferral, became impossible. Petitioner had no other business purpose and no business activity during the year 1977. To the extent that it received funds, it served as a conduit of the income earned by APC. As a mere conduit, petitioner was essentially acting as an agent for APC. Under the principles set forth in *Commissioner v. Bollinger*, 485 U.S. __ (1988), APC, rather than petitioner, is the proper taxpayer with respect to the income earned during the taxable year 1977. [4]

This is not a case where we need be concerned with the equities of allowing a taxpayer to unfairly avoid taxation under a form which it chose. It is clear that APC formed petitioner solely to take advantage of the DISC provisions, but for which there would have been no tax advantages under the facts of this case. When respondent determined that petitioner was not qualified as a DISC, the statute of limitations was still open with respect to APC and respondent had the knowledge and ability to totally disregard this purely tax-motivated transaction.[5] Instead, respondent chose form over substance. This should not be allowed in a situation where a taxpayer fails to meet highly technical provisions of a statutory scheme that was intended to encourage and benefit taxpayers who engaged in exporting activities.[6]

---

[4]If we were to recognize petitioner as the bona fide recipient of sales commissions which are really a portion of APC's profits, we would also be violating the principle that income must be taxed to the person or entity that earned it. *Lucas v. Earl*, 281 U.S. 111 (1930).

[5]The majority does not, and could not, apply principles of equitable estoppel given the facts in this case. See *Century Data Systems, Inc. v. Commissioner*, 86 T.C. 157 (1986).

[6]In similar cases respondent has disallowed the parent's commission expense or reallocated the former DISC's "income" back to the parent under sec. 482. It is possible that respondent will now feel free to choose whichever alternative produces the most tax.

CHABOT, WHITAKER, KÖRNER, HAMBLEN, CLAPP, and GERBER, *JJ.*, agree with this dissent.