FRANK M. AND BARBARA A. LIEBER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Lieber v. Commissioner
Docket Nos. 13196-86, 41749-86, 43030-86, 10490-87, 12240-91
United States Tax Court
T.C. Memo 1993-391; 1993 Tax Ct. Memo LEXIS 402; 66 T.C.M. (CCH) 529; August 26, 1993, Filed *402 Decision will be entered under Rule 155. For petitioners in all cases: Joel Yonover. For petitioners in docket Nos. 13196-96, 41749-86, 43030-86, and 10490-87: Timothy Scott Midura, Joseph Scott Kayne, and Leonard David Rutstein. For petitioners in docket No. 41749-86: James Lloyd Kennedy, Jr. For petitioners in docket Nos. 41749-86 and 10490-87: Raymond Goldfarb. For respondent: Richard W. Kennedy and James B. Ausenbaugh. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Frank M. and Barbara A. Lieber
(Docket Nos. 13196-86, 41749-86, and 43030-86)
Docket
Additions to Tax, I.R.C.
Number
Year
Deficiency
Sec. 6621
Sec. 6661
43030-86
1977
$ 18,470.47
[1]
--
41749-86
1978
38,359.00
--
--
41749-86
1979
43,723.00
--
--
41749-86
1980
38,451.00
--
--
13196-86
1981
18,674.00
[1]
--
13196-86
1982
7,685.00
[1]
$ 769
John M. and Nancy S. Corbett
(Docket Nos. 10490-87 and 12240-91) John M. and Nancy S. Corbett
(Docket Nos. 10490-87 and 12240-91)
Additions to Tax
Docket
Sec.
Sec.
Sec.
Sec.
Number
Year
Deficiency
6621
6653(a)(1)
6653(a)(2)
6661
10490-87
1977
$ 22,846.00
[1]
--  --
--  10490-87
1978
31,435.00
[1]
--  --
--  10490-87
1979
37,960.00
[1]
--  --
--  12240-91
1980
22,419.50
[1]
$ 1,120.98
--
--  12240-91
1981
34,635.97
[1]
1,731.80
[2]
--  12240-91
1982
10,266.60
[1]
513.33
[2]
$ 2,566.65
*403 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. At issue in these cases are investments made by petitioners in limited partnerships that were syndicated by David Harris (Harris) and F. Thomas Winters (Winters). Those limited partnerships are referred to as the Harris-Winters partnerships. After settlement of certain issues, the issues for decision are: (1) Whether certain deductions claimed by petitioners' partnerships are ordinary and necessary expenses under section 162 or whether those expenses represent nondeductible capital expenditures under section 263; (2) whether petitioners are entitled to investment tax credits; (3) whether petitioners are liable for additional interest on tax-motivated transactions pursuant to the provisions of section 6621; (4) whether petitioners are liable for the additions to tax pursuant to the provisions of section 6653(a) for negligence or intentional disregard of rules and regulations; and (5) whether petitioners are liable for the additions to tax pursuant to the provisions of section 6661 *404 for substantial understatements of tax liability. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners Frank M. and Barbara A. Lieber (the Liebers) filed joint Federal tax returns for the years in issue. At the time the petitions were filed, the Liebers resided in Highland Park, Illinois. Petitioners John M. and Nancy S. Corbett (the Corbetts) filed joint Federal tax returns for the years in issue. At the time the petitions were filed, the Corbetts resided in New Castle, Pennsylvania. In 1977, the Liebers invested in two Harris-Winters partnerships identified as PIMA Investors, Ltd. (PIMA), and FAIR Investors, Ltd. (FAIR), and the Corbetts invested in a partnership identified as CASA Investors, Ltd. (CASA). Collectively, PIMA, FAIR, and CASA are referred to as the partnerships. The Harris-Winters Partnerships
From 1977 through 1980, Harris and Winters syndicated numerous single-asset real estate limited partnerships. The Internal Revenue Service (IRS) audited a number of these Harris-Winters limited partnerships, sent statutory notices of deficiency, and designated these cases *405 as a special litigation project known as "Harris-Winters Phase I". There are approximately 1,000 limited partners in the Harris-Winters Phase I partnerships. The limited partnerships that are involved here, PIMA, FAIR, and CASA, each invested in land that was already developed as a "strip" shopping center. Each of the partnership investments was structured as a lease of the underlying land and purchase of the improvements to that land. Each partnership investment involved the purchase of a shopping center from the Management Company of the Americas, Ltd. (MANCO). MANCO was organized prior to March 2, 1970, under the laws of the Bahamas. MANCO had been in business from 1971, some of its activity being in real estate ownership, management, and development on behalf of Land Investors of the Americas, N.V. (LIA). LIA was organized prior to June 12, 1970, under the laws of the Netherlands Antilles. In most instances, MANCO sought out and purchased shopping center buildings and land from independent landowners. MANCO then leased the same land and sold the same shopping center buildings to the partnerships on the same day or shortly after MANCO's own purchase. For PIMA, however, *406 MANCO leased the shopping center land and then subleased the same land to PIMA. Harris was the founder of Harris & Company (later known as National Capital Corporation) and was the promoter of the Harris-Winters Phase I real estate limited partnerships. The organizational structure of all of the Harris-Winters Phase I partnerships was similar. A partnership using the acronym "H&C" acted as general partner of the Harris-Winters Phase I partnerships, and Harris and/or Winters acted as the general partner of the H&C partnership. The general partner of PIMA was H&C PIMA, Ltd. (H&C PIMA). The general partner of FAIR was H&C FAIR, Ltd. (H&C FAIR). The general partner of CASA was H&C CASA, Ltd. (H&C CASA). H&C PIMA, H&C FAIR, and H&C CASA were Arizona limited partnerships. The partners of the above H&C partnerships included Harris and/or Winters. The limited partnership interests in all of the partnerships were sold through private offerings by Harris & Company. All of the partnerships' private placement memoranda outlined the basic information regarding the strip shopping center investment, the structure of the partnership investment, and the Federal tax aspects of the offering *407 and supplied the investor with information needed to determine whether or not to invest. Emphasized in the private placement memoranda were various tables showing the amounts and dates of required investments and anticipated tax benefits. PIMA
PIMA was a limited partnership organized under the laws of the State of Arizona. PIMA's Private Placement Memorandum offered 35 limited partnership units at approximately $ 40,000 per unit for a total original anticipated amount to be raised of $ 1,400,000. The land involved in the PIMA investment was originally owned by Richard M. and Fanchon B. Drachman (the Drachmans). On November 1, 1958, the Drachmans leased the land to Campbell Development Company (Campbell Development) for a term of 99 years. Less than 2 years later, on July 27, 1960, Campbell Development assigned its interests in the lease to Campbell Plaza, a limited partnership. Campbell Plaza developed the property into a strip shopping center (Campbell Plaza Shopping Center), and, during the course of development, Campbell Plaza subleased the premises to a variety of retail stores. In 1972, after various assignments of the Drachman lease over the years, Allan Elias *408 (Elias), d/b/a Campbell Plaza Shopping Center, held the interest in the lease and owned the Campbell Plaza buildings that were subject to a $ 1,350,000 note held by Western Savings & Loan Association (the Western Savings note). Sometime before April 30, 1977, MANCO entered into negotiations to purchase the Campbell Plaza Shopping Center from Elias. In that same month but before MANCO finalized the agreement with Elias, MANCO and PIMA entered into an Agreement of Sale and Purchase of Campbell Plaza Shopping Center (the MANCO-PIMA sales agreement). The terms of the MANCO-PIMA sales agreement provided that the purchase price for the improvements only of the Campbell Plaza Shopping Center was $ 1,967,000, which was paid as follows: (a) $ 1,000 by note to be deposited in escrow, which note was payable at the close of escrow and did not bear interest; (b) $ 64,000 in cash to be deposited in escrow; and (c) $ 1,902,000 by nonrecourse purchase money note. In April 1977, Elias hired Sanders K. Solot (Solot) of Solot Company Real Estate Services to appraise the land and improvements. Solot indicated that the estimated fair market value of Campbell Plaza Shopping Center in 1977 was $ 3,640,000. *409 This total consisted of the lessor's interest of $ 620,000 on the 99-year Drachman lease and a $ 3,020,000 leasehold interest. The value of the land would have been $ 1,100,000 if unencumbered by the 99-year lease. On June 16, 1977, Elias entered into an Agreement for Sale and Purchase of Campbell Plaza Shopping Center with MANCO for all of the buildings and improvements comprising the Campbell Plaza Shopping Center. The purchase price was $ 2,350,000, including the assumption by MANCO of the Western Savings note that had an approximate balance of $ 1,250,000. Stewart Title & Trust of Tucson insured the interests being purchased by MANCO from Elias for $ 2,350,000. The closing for the MANCO-PIMA purchase took place on July 1, 1977, simultaneously with the closing on the Elias-MANCO purchase. As part of the sales transactions, Elias, as trustee, as of July 1, 1977, assigned to MANCO all of his right, title, and interest in and to the leases of the premises to various tenants, and MANCO assigned those rights to PIMA. PIMA, as purchaser, took title to the Campbell Plaza Shopping Center buildings, subject to the Western Savings note. FAIR
The FAIR Private Placement Memorandum *410 (FAIR PPM) offered 35 limited partnership units at approximately $ 26,000 per unit for a total original anticipated amount to be raised of $ 900,000. Prior to May 26, 1977, Roy L. Martin and Associates, Ltd. (Martin), developed Fair Park Shopping Center in San Antonio, Texas, and Wendy's Old Fashioned Hamburger Restaurant located in Greenfield, Massachusetts. On May 2, 1970, Martin mortgaged Fair Park Shopping Center to the Southland Life Insurance Company (Southland), a Texas insurance company, for $ 2,050,000. Contemporaneously, Martin and Southland entered into a rental participation agreement whereby Southland was entitled to receive 25 percent of the rental fees due to Martin from the tenants of Fair Park Shopping Center. Sometime prior to May 1, 1977, title to Fair Park Shopping Center was vested in Fair Park Center, Ltd., a limited partnership. MANCO purchased that shopping center and land from Fair Park Center, Ltd., on an unspecified date. On June 15, 1977, MANCO and FAIR entered into an Agreement of Sale and Purchase (the MANCO-FAIR sales agreement) of the buildings and improvements that constituted Fair Park Shopping Center together with the buildings and improvements *411 that constituted Wendy's Old Fashioned Hamburger Restaurant and the personal property used in connection therewith. The purchase price was $ 2,226,500, which was paid as follows: (a) $ 1,000 by note to be deposited in escrow, which note was payable at the close of escrow and did not bear interest; (b) $ 52,500 in cash to be deposited in escrow; and (c) $ 2,173,000 by nonrecourse purchase money note, which note was payable as follows: (i) $ 10,500 interest payable October 2, 1977, and (ii) $ 18,010 payable monthly commencing July 1, 1978, and ending when the note was paid in full. Interest was payable on this note at the rate of 10 percent per annum. This note was secured by a Deed of Trust on Fair Park Shopping Center. The closing for the MANCO-FAIR purchase took place on October 14, 1977. As part of the sales transactions, Fair Park Center, Ltd., assigned to MANCO all of its right, title, and interest in and to the leases of the premises to various tenants, and MANCO assigned those rights to FAIR. FAIR, as purchaser, took title to such improvements, subject to the then-existing mortgage on the premises in favor of Southland in the original amount of $ 2,050,000. Title Insurance *412 Company of Minnesota insured MANCO's interest and FAIR's interest in the principal sum of $ 2,256,313.84. In an appraisal report dated August 14, 1992, L. Randall Denton and Richard C. Dugger indicated the estimated market value of Fair Park Shopping Center to be $ 2,040,000 as of the end of 1977. The land was valued separately at $ 705,000. This appraisal was commissioned by petitioners for the trial in these cases in October 1992. CASA
The CASA Private Placement Memorandum offered 34 limited partnership units at approximately $ 35,000 per unit for a total original anticipated amount to be raised of $ 1,175,000. Prior to August 4, 1969, Casa Adobes Estates Subdivision, Pima County, Arizona, had been developed into a strip shopping center. On August 4, 1969, Elias purchased the real estate from Trans-Southwest Development Corporation. Elias did business as Casa Adobes Shopping Plaza (Adobes) at this location. On April 30, 1975, Elias and his wife mortgaged the premises to the Northwestern Mutual Life Insurance Company (Northwestern Mutual), a Wisconsin Corporation, for $ 2,400,000. On January 31, 1977, Elias entered into an agreement to sell Adobes to MANCO. MANCO *413 paid to Elias $ 630,000 as a down payment, delivered to Elias a purchase money note for $ 320,000 at 8-percent interest per annum, and assumed the Northwestern Mutual mortgage, which at that time was approximately $ 2,270,000. Stewart Title & Trust of Tucson insured the property for $ 2,890,000. Prior to the sale, Elias hired Solot to appraise the land and improvements. In a report dated March 4, 1977, Solot appraised the fair market value of Adobes at $ 3,280,000. Solot did not break down this value into separate values for land and for improvements. On April 1, 1977, MANCO and CASA entered into an Agreement of Sale and Purchase of Adobes to CASA (the MANCO-CASA sales agreement). The terms of the MANCO-CASA sales agreement provided that the purchase price for the improvements only of Adobes was $ 2,935,000, which was paid as follows: (a) $ 1,000 by note to be deposited in escrow, which note was payable at the close of escrow and did not bear interest; (b) $ 44,000 in cash to be deposited in escrow; (c) $ 20,000 by note as down payment to be deposited in escrow before closing, which note was payable 2 years from closing bearing 0-percent interest; and (d) $ 2,870,000 by nonrecourse *414 purchase money note with an annual interest rate of 7.4 percent, which note was secured by a purchaser money mortgage on the premises, subject to the Northwestern Mutual mortgage and the purchase money mortgage given by MANCO to Elias. Stewart Title & Trust of Tucson insured the interests being purchased by CASA from MANCO for $ 2,935,000. The closing for the MANCO-CASA purchase took place on April 29, 1977, simultaneously with the closing on the Elias-MANCO purchase. The Partnerships
Each of the partnerships' sales agreements contained identical provisions for the following fees: PIMA
At Closing
1978
1979
1980
Rental fee
$  95,000
$ 116,000
$ 116,000
$ 21,000
(Plus a 10-percent participation in
rental fees above $ 210,000 per annum.)
Land lease discount fee
60,000
70,000
54,000
24,000
Mortgage guarantee fee
95,000
-0-
-0-
-0-
Noncompetition fee
35,000
55,000
55,000
-0-
Prepayment penalty fee
125,000
-0-
-0-
-0-
Property management fee
40,000
40,000
40,000
40,000
Current interest
14,000
26,000
7,000
[1] 3,500
*415 FAIR
At Closing
1978
1979
1980
Rental fee
$  90,000
$ 45,000
$ 1,000
$ 1,000
Land lease discount fee
112,000
85,000
-0-
-0-
Mortgage guarantee fee
109,000
-0-
-0-
-0-
Noncompetition fee
30,000
20,000
-0-
-0-
Prepayment penalty fee
127,000
-0-
-0-
-0-
Property management fee
39,000
15,000
-0-
-0-
Current interest
10,500
-0-
-0-
-0-
CASA
At Closing
1978
1979
1980
Rental fee
$  95,000
$ 90,000
$  1,500
$ 1,500
Land lease discount fee
185,000
80,000
-0-
-0-
Mortgage guarantee fee
130,000
-0-
-0-
-0-
Noncompetition fee
50,000
50,000
20,000
-0-
Prepayment penalty fee
95,000
-0-
-0-
-0-
Property management fee
30,000
30,000
-0-
-0-
Current interest
20,000
13,000
2,000
-0-
The rental fees, land lease discount fees, noncompetition fees, prepayment penalty fees, and property management fees were to be paid to MANCO. The mortgage guarantee fees were to be paid to LIA. The parties have agreed that the useful lives of the improvements to the properties in 1977 were as follows: Campbell Plaza Shopping Center (PIMA), 15 years; Fair Park Shopping Center (FAIR), 20 years; and Adobes *416 (CASA), 14-1/2 years. Rental Fees and Land Lease Discounts
As part of the transactions, MANCO entered into leases under which it leased to the partnerships the interests in land. The leases provided reduced rental fees beginning in 1980 if the lessees (the partnerships) paid the lessor (MANCO) a lump sum "land lease discount". The land lease discount fee was $ 208,000 for PIMA, $ 197,000 for FAIR, and $ 265,000 for CASA. The terms of the leases taking account of the land lease discounts are summarized in the following chart: After
1977
1978
1979
1979
PIMA
$ 90,500
$ 116,000
$ 116,000
$ 21,000
(Plus 10 percent of gross rental fees above
$ 210,000 per annum.)
FAIR
90,000
45,000
1,000
1,000
CASA
95,000
90,000
18,000
18,000
For PIMA, after 1979, the rental fee was to be $ 116,000; however, the land lease discount reduced monthly rental fees to $ 21,000 for 23 years. For FAIR, after 1978, the rental fee was to be $ 90,000; however, the land lease discount reduced monthly rental fees to $ 1,000 for 20 years. For CASA, after 1978, the rental fee was to be $ 90,000; however, the land lease discount reduced monthly rental fees to $ *417 18,000 for 20 years. In addition, commencing in the fourth year of the lease, as a result of paying the land lease discount fee, FAIR had the option to purchase the fee interest of the lessor upon payment of $ 225,000 for the San Antonio, Texas, property and $ 50,000 for the Greenfield, Massachusetts, property. For CASA, commencing in the third year of the lease, as a result of paying the land lease discount fee, the lessee had the option to purchase the fee interest of the lessor upon payment of $ 225,000 in cash. The partnerships, in later years, actually received the underlying leaseholds and land from MANCO as part of a settlement with MANCO for not meeting obligations under certain guarantees with the partnerships. Petitioners capitalized and amortized the land lease discount fees over the discount periods ranging from 20 to 23 years. The underlying leases ran for either 55 or 60 years. Mortgage Guarantee Fees
Among the terms of sale, MANCO required the partnerships to furnish to MANCO a 5-year guarantee by a company selected by the partnerships guaranteeing that, in the event that MANCO foreclosed on the purchase money promissory note described in the sales agreements, *418 the guarantor would pay to MANCO the difference between the sales price of the property on foreclosure and the outstanding principal balance plus unpaid interest on the purchaser's purchase money promissory note. LIA was chosen by the partnerships as the guarantor. The sales agreements for the PIMA and FAIR partnerships described the fee as follows: Guarantee of Deficiency Payment. Seller requires that Purchaser furnish to Seller a guarantee from a company selected by Purchaser that in the event Seller forecloses on Purchaser's Purchase Money Deed of Trust, for a term of five (5) years from the date thereof, said guarantor shall pay Seller the difference between the sale price of the property on foreclosure and the outstanding principal balance plus unpaid interest on Purchaser's Purchase Money Promissory Note. * * *
The CASA partnership agreement contained the same clause but did not state a 5-year term for the guarantee. The parties, however, have stipulated that the 5-year term is applicable to CASA. Noncompetition Fees
At the time of the sale of the shopping center properties by MANCO to the partnerships, MANCO had also purchased and was managing other *419 shopping centers in Pima County, Arizona, and in San Antonio, Texas. All such shopping centers were outside a 3-mile radius of the subject partnerships. The partnerships each paid to MANCO a "noncompetition fee" under which MANCO agreed that neither it nor any affiliate would purchase, sell, develop, or operate any commercial real estate within a 3-mile radius of the partnerships' shopping centers for 3 years (2 years in the case of FAIR). The amounts paid totaled $ 145,000 for PIMA, $ 50,000 for FAIR, and $ 120,000 for CASA. Prepayment Penalty Fees
The sales agreements and purchase money promissory notes listed provisions that the partnerships could not prepay interest or principal for 10 years on the purchase money promissory notes between the partnerships and MANCO, but these penalties could be waived during the first 5 years by payment of certain fees. The partnerships paid these waiver fees to MANCO. Property Management Fees
The partnerships entered into management agreements with MANCO that provided as follows: During the course of the Management Agreement, MANCO was to collect all income and pay out of cash income all costs, expenses, and debt service attributable *420 to the shopping centers. If there was a deficiency in the amounts needed to pay such costs, expenses, and debt service, MANCO was to advance the necessary sums. In addition, MANCO was to repair, maintain, and operate the shopping centers, keep books and records with respect to the shopping centers, and maintain a force of employees for those purposes. MANCO was required to pay to the partnerships quarterly, regardless of the cash flow from operations, a guaranteed percentage return per annum on all invested capital. For its services, MANCO was to be paid $ 40,000 by PIMA in each of 5 years, $ 54,000 total by FAIR, and $ 30,000 by CASA in each of 4 years. The Management Agreement was terminable by the partnerships at any time with written notice if, at any time, MANCO failed to make required payments, there were other breaches of the Management Agreement, MANCO filed a petition in bankruptcy, there were an assignment for the benefit of creditors, or a trustee or receiver were appointed for MANCO. MANCO did not perform the duties set out in the agreement but did make the guaranteed return on capital payments as set forth above. Organizational Expenses, Financial Advisory *421 Fees, and Guaranteed Payments to Partners
The partnerships paid the H&C general partners or entities related to those partners the following fees in accordance with the partnership agreements: PIMA
1977
1978
1979
1980
Guaranteed payments
to partners
$ 70,000
$ 44,000
$ 44,000
-0-
Organizational expenses
65,000
-0-
-0-
-0-
Financial advice fee
55,000
-0-
-0-
-0-
FAIR
1977
1978
1979
1980
Guaranteed payments
to partners paid to
H&C FAIR
$ 77,000
$ 22,000
-0-
-0-
Organizational expenses
1,500
4,500
$ 4,500
$ 4,500
Financial advice fee paid
to H&C FAIR
45,000
-0-
-0-
-0-
CASA
1977
1978
1979
1980
Guaranteed payments
to partners paid to
Harris & Co.
$ 62,000
$ 33,000
$ 7,000
-0-
Organizational expenses
2,667
4,800
4,800
$ 4,800
Financial advice fee paid
to Harris & Co.
47,000
-0-
-0-
-0-
The private placement memoranda of all three partnerships contained the following language to explain the organizational expenses paid by the partnerships: The General Partnership shall pay all of the Organizational Expenses of the Partnership in excess of Sixty-five Thousand Dollars *422 ($ 65,000) [$ 20,000 each for CASA and FAIR], including any Selling Commissions which are payable and projected to be eight percent (8%) of the gross offering proceeds. Said expenses shall not include the Financial Advisory Fee or the General Partner Salary.
On their returns, the partnerships amortized over 5 years the following total amounts as organizational expenses: PIMA $ 65,000; FAIR $ 22,500 (the FAIR PPM stated this amount to be $ 20,000); and CASA $ 20,000. The financial advisory fee was described in the partnership agreement as follows: "The General Partners shall receive out of the proceeds of the Offering a Financial Advisory Fee". The guaranteed payments to partners were payments to the general partners for establishing the books and records, purchasing the computer system, overseeing the property management aspects of the partnership, and performing due diligence activities. Although the general partners were to perform certain services to the investor partnerships during the life of the partnerships, the agreements did not provide for any salary to be paid to them after the first 2 or 3 years. As well, for CASA, the payments were made to Harris & Co. rather *423 than to its general partner, H&C CASA. Summary
The following table summarizes the purchase prices paid by MANCO and the partnerships for the shopping center properties: Paid by
Paid by Paid by Appraised MANCO for
Partnership Partnership Value Land and for for Improvements
Land and
Improvements Improvements
Incl. Fees
Improvements
PIMA
$ 2,337,697
$ 1,967,000
$ 2,416,000
$ 3,640,000
FAIR
Not in record
2,225,500
2,743,000
2,745,000
CASA
3,270,247
2,935,000
3,540,000
3,280,000
OPINION Respondent determined in the statutory notices and argues on brief that various "up front fees", including payments for rental fees and land lease discounts, mortgage guarantee fees, noncompetition fees, mortgage prepayment penalties, property management fees, current and prepaid interest, organizational expenses, and financial advisory fees, must be capitalized and amortized over various periods of time. Respondent states that "There is no question of the total amounts being deducted eventually -- the question is exactly when the amounts are to be deducted." Respondent argues that the structure of the transactions, in which the partnerships *424 purchased the improvements only and leased the land, was "abnormal" and that the contracts were intended artificially to load the early years of the projects with deductible expenses. Respondent asks that we treat all of the expenses as representing part of the purchase price of realty or of assets with a useful life in excess of 1 year or as syndication expenses. Thus, according to respondent, the items in dispute are not "ordinary" expenses as that term is used to differentiate between expenses that are currently deductible and those that are capital. See generally sec. 263(a); Indopco, Inc. v. Commissioner, 503 U.S.   , 112 S. Ct. 1039 (1992); Commissioner v. Idaho Power Co., 418 U.S. 1 (1974); Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971); Commissioner v. Tellier, 383 U.S. 687 (1966). As indicated below, petitioners have admitted that some of the expenses should be capitalized but dispute the period of amortization. As to most, for the reasons indicated below, we agree with respondent. Because certain specific Code sections *425 and other considerations apply to particular items, however, we discuss them separately below. Use of terms such as "fees", "payments for", "expenses", or similar terms is for convenience only and does not necessarily reflect our conclusions as to the substance of those items. Similarly, our use of terms set forth in the agreements entered into by the partnerships is not agreement that those terms accurately describe the transactions. Rental Fee and Land Lease Discounts
Respondent determined that amounts paid by the partnerships to MANCO as rental fees and as land lease discounts were not ordinary and necessary business expenses under section 162 but, rather, were part of the purchase prices of the shopping centers. In the alternative, respondent determined that the fees were advance rental fees and that the land lease discounts were "bonuses" paid by the partnerships to obtain the leases from MANCO and, as such, both fees should be capitalized and amortized over the lives of the leases. Section 162(a)(3) allows a deduction for all ordinary and necessary expenses incurred in carrying on a trade or business, including: (3) rentals or other payments required to be made *426 as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.
Whether purported rental payments are in substance payments of part of the purchase price is a question of fact. M & W Gear Co. v. Commissioner, 54 T.C. 385, 395 (1970), affd. on this issue, revd. in part, and remanded 446 F.2d 841 (7th Cir. 1971). "The relationship between the amount of the 'rental' payments and the * * * [taxpayer's] contention as to the fair market value of the property is also instructive." Id.
Here, the PIMA-MANCO written agreement was in the form of a lease, and the FAIR-MANCO and the CASA-MANCO written agreements were in the form of leases with options to purchase the underlying land. However, the form of the agreement or the characterization thereof by the parties is not binding on the Court. Even if the parties entered into an agreement that they believed to be a lease but that had all the characteristics of a sale, it would nevertheless be treated as a sale for tax purposes. Bowen v. Commissioner, 12 T.C. 446 (1949); *427 Mills v. Commissioner, 11 T.C. 25 (1948). Whether an agreement, which in form is a lease, is in substance a conditional sales contract depends upon the intent of the parties as shown by the provisions of the agreement, read in light of the attending facts and circumstances existing at the time the agreement was executed. In ascertaining such intent, no single test, or any special combination of tests, is determinative. Each case must be decided in light of its particular facts. Miller v. Commissioner, 85 T.C. 1064, 1074 (1985) (citing Northwest Acceptance Corp. v. Commissioner, 58 T.C. 836, 844-850 (1972), affd. 500 F.2d 1222 (9th Cir. 1974)), and Western Contracting Corp. v. Commissioner, 271 F.2d 694 (8th Cir. 1959). Whether an equity interest rather than a lease has been obtained by a taxpayer is tested by whether the transaction: (1) Is genuinely multiple-party, (2) has economic substance, (3) is compelled or encouraged by business realities, and (4) is imbued with tax-independent considerations that are not shaped solely by *428 tax-avoidance features. Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Hilton v. Commissioner, 74 T.C. 305, 347 (1980), affd. 671 F.2d 316 (9th Cir. 1982). The partnerships' rental payments and the land lease discounts taken together resulted in large rental expenses, large amortization of lease discounts, and large corresponding tax deductions in the early years that the partnerships were in business. The land lease discount was amortized on the partnerships' returns over the discount period (23 years for PIMA and 21 years for FAIR and CASA); however, the term of the leasehold interests ran from 55 to 60 years. Petitioners provided no explanation for the differential in rental fees except that land lease discounts were paid to reduce future years' rental fees. Aside from the tax benefits, they have established no business purpose for the rental fee differential nor for the accelerated rental fees in the early years of the leases. Adding together the early years' rental payments plus the land lease discount payments, the partnerships paid amounts that are comparable to the total prices *429 paid by MANCO for the underlying partnership land or leasehold. For PIMA, 4 years' rental and lease discount payments totaled $ 551,500; this amount is comparable to the value of the leasehold interest in the land only that was determined by subtracting the lessor's interest in the land ($ 620,000) from its unencumbered value ($ 1,100,000). For FAIR, approximately half of the total appraised land value ($ 705,000) was paid as rent in the first 4 years of the 21-year lease. For CASA, the appraisal did not separate the land value for comparison here. In addition, for FAIR and CASA, the land lease discounts allowed those partnerships to purchase the underlying land at a substantially reduced price after holding the lease for a 3-year period (4 years for CASA). FAIR was to pay $ 225,000 in 1980 for land valued at $ 705,000 in 1977. CASA was to pay $ 225,000 in 1981, but the 1977 land value is not in the record for this comparison. In later years, as part of a settlement with MANCO, the land was actually transferred to the partnerships without these payments. All of these factors, taken together, indicate that the partnerships were purchasing the underlying leasehold interest or *430 land rather than renting the property from MANCO. Petitioners rely on International Minerals and Chemical Corp. v. Commissioner, T.C. Memo. 1984-147, interpreting the four Frank Lyon Co. factors listed above. That case is distinguishable, because there the lease rental fees paid by the taxpayers were a uniform royalty tied to the production from the land, whereas the rental fees paid by petitioners here decreased without regard to the productivity of the shopping centers. Also, the International Minerals and Chemical Corp. lease did not contain options to purchase the underlying land, and the underlying land was not ever transferred to the taxpayer. We agree with respondent on this issue and hold that the rental fee and land lease discount payments, taken together, represent the partnerships' equity interest in land. Based on our determination, we do not reach respondent's alternative arguments. The amounts paid must be capitalized as land (FAIR and CASA) or leasehold (PIMA). For PIMA, the amount must be amortized over the term of the underlying Drachman lease. Mortgage Guarantee Fees
The partnerships claimed a deduction for "mortgage *431 guarantee fees" that were paid to LIA to ensure the partnerships' payments on the nonrecourse mortgage with MANCO. PIMA paid $ 95,000, FAIR paid $ 109,000, and CASA paid $ 130,000 for the guarantee fees. Respondent's position is that the mortgage guarantee agreement is a sham transaction and that the deductions should be disallowed because the purchasers (the partnerships) chose the guarantors for the sellers' (MANCO's) money. Respondent argues that it is unusual that the sales contract specified how much a third party would be paid to provide the guarantee. In the alternative, respondent contends that the fees should be amortized over the term of the underlying mortgage. Petitioners admit that the fees should have been capitalized rather than deducted in the year paid, but they argue that the amortization term should be the 5-year terms of the agreements rather than the full terms of the mortgages. The evidence presented at trial by petitioners was that guarantee payments were made by each of the partnerships to an independent third party, LIA, in order to guarantee the partnerships' payments on their nonrecourse mortgages with MANCO. Winters testified and petitioners' expert, *432 Roland Freeman (Freeman), emphasized that the purpose of the mortgage guarantee fee was to enhance the availability of credit and to ensure the partnerships a lower rate of interest on their loans with MANCO. Freeman indicated that the loan rates obtained by the partnerships on the nonrecourse loans were below market rates in 1977. Respondent has presented no contrary evidence from which we could determine that this form of guarantee was a sham. Fees paid to obtain loans are capital expenditures that may be ratably deducted over the life of the loan. Detroit Consolidated Theatres, Inc. v. Commissioner, 133 F.2d 200 (6th Cir. 1942), affg. per curiam a Memorandum Opinion of this Court dated Aug. 28, 1941; Duncan Industries, Inc. v. Commissioner, 73 T.C. 266, 275 (1979). Because the fees were paid to obtain lower interest rates that accrue over the lives of the mortgages, we agree with respondent's alternative argument that the fees should be amortized over the lives of the mortgages. Noncompetition Fees
The sales agreements included payments for noncompetition fees whereby MANCO agreed not to purchase, sell, *433 develop, or operate any commercial property within a 3-mile radius of the partnerships' properties. The noncompetition agreements were in effect for 3 years for PIMA and CASA and for 2 years for FAIR. The fees were not paid as a lump sum but, rather, were allocated over the terms of the noncompetition agreements. The partnerships apparently deducted the fees in the years paid, although this is unclear from the tax returns. Respondent determined that the fee agreements lacked economic substance and were disguised payments of the purchase price for the properties. With respect to covenants not to compete, courts have applied two principles: (1) Parties should be free to contract, and their contracts should be upheld, yet (2) substance must prevail over form. Patterson v. Commissioner, 810 F.2d 562, 570 (6th Cir. 1987), affg. T.C. Memo. 1985-53. Here, the evidence indicates that the covenants were actually part of the purchase prices of the partnerships' property. The property was purchased by MANCO and sold to the partnerships on the same day. It is unlikely that MANCO could have established a relationship with the shopping *434 center tenants that would cause them to follow MANCO to its next development. Freeman testified that it would take at least 2 years to construct a competing shopping center. Competition from MANCO was not likely to be a threat. We are not persuaded that PIMA would pay $ 145,000, FAIR would pay $ 50,000, or CASA would pay $ 120,000 to ensure that MANCO would not compete within a 3-mile radius for 3 years (2 years for FAIR). Thus, the deductions are disallowed, and those amounts will be included in the basis of the properties purchased. Mortgage Prepayment Penalties
Certain clauses in the mortgages entered into between the partnerships and MANCO provided that the partnerships would be penalized for prepaying principal or interest on the MANCO notes. The prepayment penalties were in effect for 10 years but could be waived during the first 5 years by payment of certain fees. The fee for PIMA was $ 125,000, for FAIR was $ 127,000, and for CASA was $ 95,000. The partnerships deducted these fees in the year paid. Respondent asserts that the prepayment penalty waivers were really prepaid interest and, as such, are amortizable over the lives of the loans. Petitioners assert *435 that the prepayments were expenses that should have been amortized over 5 years, the term of the waiver period for the penalties. Prepayment penalties on mortgage loans to partnerships, in general, constitute interest substitutes or additional mortgage loan fees. General Am. Life Ins. Co. v. Commissioner, 25 T.C. 1265 (1956). The fees paid to waive these penalties are likewise fees paid for the use or forbearance of money and, as such, should also be treated as interest substitutes. As interest, the prepayments should be amortized over the life of the loan. Sandor v. Commissioner, 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976). Petitioners' own expert admitted that the characterizations in the agreements were incorrect and that the fees were really interest. We reject petitioners' arguments that the amounts should be amortized over the 5-year period set out in the sales agreements, because those agreements are inaccurate as to the substance of the payments. Property Management Fees
The sales agreements entered into by the partnerships provided for management fees to be paid *436 to MANCO. Petitioners concede that MANCO did nothing to earn these fees. Petitioners argue, however, that the fees are mislabeled and that they actually represent "no-negative-cash-flow" guarantees from MANCO to the partnerships. There is insufficient evidence in the record to support petitioners' assertion that the purpose of the management fee was to compensate MANCO for undertaking the risk of insuring that the partnerships had adequate cash flow. The payments are not currently deductible. See Estate of Boyd v. Commissioner, 76 T.C. 646, 667 (1981). Current Interest
Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. Respondent determined that the partnerships' current interest deductions were actually prepaid interest that should have been capitalized and amortized over the term of their notes to MANCO. It is unclear from the partnerships' tax returns and from the loan documents in the record whether the current interest payments to MANCO were part of the yearly interest due or were in addition to those amounts. Thus, we sustain respondent's determination that the payments represented *437 prepaid interest, and the current interest deductions are disallowed. See Sandor v. Commissioner, 62 T.C. 469, 474-475 (1974), affd. 536 F.2d 874 (9th Cir. 1976). Organizational Expenses, Financial Advisory Fees, and Guaranteed Payments to Partners
Section 709(a) governs the treatment of organizational and syndication fees and disallows deductions for the amounts paid to organize partnerships or to promote the sale of interests in partnerships. Respondent asserts that petitioners' organizational expenses, financial advisory fees, and guaranteed payments to partners are really syndication expenses that must be capitalized. Respondent argues, in the alternative, that, even if some of these expenses were organizational expenses, petitioners cannot amortize them over a shorter period than the lives of the partnerships because petitioners did not elect to do so under section 709(b). The only evidence presented at trial on these items was petitioners' expert's reports. Petitioners' expert, Freeman, determined that petitioners had improperly allocated portions of their organizational expenses and syndication fees to financial *438 advice fees and guaranteed payments to partners. In particular, for PIMA, the expert determined that the partnership had incurred $ 34,000 in organizational expenses and $ 75,000 in syndication expenses; yet PIMA deducted $ 65,000 in organizational expenses, $ 55,000 in financial advice fees, $ 70,000 in guaranteed payments to partners, and no syndication expenses in 1977. The $ 31,000 excess deducted as organizational expenses and all of the financial advice fees and the 1977 guaranteed payments to partners should be capitalized as syndication expenses. Likewise, petitioners capitalized $ 22,500 for FAIR and $ 20,000 for CASA in organizational expenses and amortized those amounts over 60 months; Freeman determined that an additional $ 6,500 for FAIR and $ 12,000 for CASA should have been capitalized as organizational expenses rather than deducted in other categories. This testimony was not controverted, and we agree that petitioners are allowed this amount as organizational fees. However, petitioners have not shown that the remainder of the fees deducted as either financial advisory fees or the 1977 guaranteed payments to partners should be allowed. In addition, based on our *439 review of the private placement memoranda and other evidence in the record, we conclude that the services performed for the partnerships by the general partners in 1977 were in connection with syndicating the partnerships, organizing the partnerships, acquiring the shopping center properties and land leases, and other preoperational expenses, all of which must be capitalized. Surloff v. Commissioner, 81 T.C. 210, 240 (1983). In later years, the evidence supports the conclusion that the salaries paid to partners were for managing the partnerships. Thus, we sustain respondent's determination to capitalize the organizational, financial advice, and 1977 guaranteed payments to partners fees as syndication costs and to amortize those capitalized amounts over the life of the partnership, except for the organizational expenses of $ 34,000 for PIMA, $ 29,000 for FAIR, and $ 32,000 for CASA. Section 709(b) allows a taxpayer an election to amortize organizational fees over 60 months; the election does not apply to syndication fees. Section 709(b) provides as follows: (b) Amortization of Organization Fees. -- (1) Deduction. -- Amounts paid or incurred *440 to organize a partnership may, at the election of the partnership (made in accordance with regulations prescribed by the Secretary), be treated as deferred expenses. Such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the partnership (beginning with the month in which the partnership begins business), or if the partnership is liquidated before the end of such 60-month period, such deferred expenses (to the extent not deducted under this section) may be deducted to the extent provided in section 165. (2) Organizational expenses defined. -- The organizational expenses to which paragraph (1) applies, are expenditures which -- (A) are incident to the creation of the partnership; (B) are chargeable to a capital account; and (C) are of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life.
PIMA, FAIR, and CASA were organized in 1977; section 709(b) was a new Code section applicable to the partnerships for the first time in 1977. At the time the partnerships filed their initial tax returns, neither regulations nor proposed *441 regulations were in effect to guide the taxpayers on what would be a proper election. Proposed regulations were published in the January 11, 1980, Federal Register, sec. 1.709-1(c), Proposed Income Tax Regs., 45 Fed. Reg. 2350 (Jan. 11, 1980), and regulations were issued on May 4, 1983, T.D. 7891, 1983-1 C.B. 117; sec. 1.709-1(c), Income Tax Regs., 48 Fed. Reg. 20048 (May 4, 1983). Respondent relies on the 1983 regulations in asserting that the partnerships made an inadequate election in 1977, because those regulations require a taxpayer to disclose on the tax return each amount over $ 10 that was paid as an organizational expense and the date paid. Sec. 1.709-1(c), Income Tax Regs.
On the 1977 returns filed for the partnerships, organization expenses were deducted as amortized over a 5-year period. The partnerships thus made the section 709(b) election based on information available to them when they filed their 1977 returns. They should not be held to the standards of a procedural regulation issued several years later in proposed form and finally promulgated 6 years later. See *442 Addison International, Inc. v. Commissioner, 90 T.C. 1207, 1218-1219 (1988), affd. 887 F.2d 660 (6th Cir. 1989). In any event, we agree with petitioners' argument that the partnerships substantially complied with requirements of section 709(b)(1). See Taylor v. Commissioner, 67 T.C. 1071, 1076-1079 (1977); Hoffman v. Commissioner, 47 T.C. 218, 236-237 (1966). Investment Tax Credits
Petitioners claimed investment tax credits on partnership property acquired in 1977 and on improvements to the partnerships' properties from 1979 through 1982. Section 38 allows an investment tax credit on "section 38 property". Section 48 defines "section 38 property" to include tangible personal property or other tangible property but not buildings or their structural components. See generally Morrison, Inc. v. Commissioner, 891 F.2d 857 (11th Cir. 1990), affg. T.C. Memo. 1986-129; Scott Paper Co. v. Commissioner, 74 T.C. 137, 183 (1980); sec. 1.48-1(e)(2), Income Tax Regs.
Petitioners *443 rely solely on vague testimony of Winters and their expert, Freeman, estimating the dollar value of property eligible for the investment tax credit. Winters testified as follows: Q In reference to investment tax credit, Mr. Winters, are you aware of the investment tax credit taken by the partnership in tax year 1977? A Not the specific number right now, but, yes, we did take an investment tax credit. Q How did you allocate between tangible property, personal property, and prudence? A Analyzed various components of the shopping center, compared it with Means Standard Form book, which is sort of a guideline with -- inside the building industry relative to typical prices and allocations -- went through, as I said, the various components, came up with evaluation, and applied a tax credit value on that. Q What treatises did you use to help you? A Mainly it was Means property valuations, because we had used them in the past, and on the projects that had been previously audited, we had not lost anything or had an adjustment. Means breaks down everything from ceiling tiles to straps to bibs to pins to trusses to -- you know, everything. And I had also discussed with various appraisers *444 who we had used who did things for lenders relative to what their valuation was of certain component items.
The expert's report failed to provide any details from which we could conclude whether components of the shopping centers constitute section 38 property. There is no evidence of the costs or other basis of particular components. Petitioners' evidence in this regard is totally inadequate, and no investment tax credit may be allowed. Additions to Tax
Respondent determined in the notices of deficiency that petitioners are liable for the section 6621(c) additional interest for all of the years in issue, except for the Liebers for 1978, 1979, and 1980. In her answer, respondent did not allege that this additional interest would apply to the Liebers in 1978, 1979, or 1980 and has not moved to amend that answer. Thus, this additional interest is not before the Court as to the Liebers for 1978, 1979, or 1980. Section 6621(c)(1) provides that, in the case of a substantial underpayment attributable to a tax-motivated transaction, the annual rate of interest shall be 120 percent of the usual rate of interest applicable to an underpayment. For this purpose, a substantial *445 underpayment attributable to a tax-motivated transaction is defined as an underpayment that is attributable to one or more tax-motivated transactions if the amount of the underpayment for a year exceeds $ 1,000. The definition of "tax-motivated transactions" includes "any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period". Sec. 6621(c)(3)(A)(iv). In Bailey v. Commissioner, 90 T.C. 558, 628 (1988), affd. in part and remanded on another issue 912 F.2d 44 (2d Cir. 1990), the Court determined that the deduction from income of management fees that should have been capitalized and amortized was a distortion of income under section 6621(c)(3)(A)(iv). See also sec. 301.6621-2T, Temporary Admin. & Proced. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). Petitioners deducted management fees and other items that should have been capitalized and amortized over the lives of the partnerships or over the lives of related assets. Early deductions of these fees caused distortion of income comparable to the *446 deduction of management fees in Bailey. Petitioners are liable for the additional interest determined in the notices of deficiency. Section 6653(a)(1) provides for an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) provides for a further addition to tax equal to 50 percent of the interest due on the underpayment attributable to negligence. Respondent determined in the Corbetts' notices of deficiency that section 6653(a)(1) applied to the deficiencies in 1980, 1981, and 1982 and that section 6653(a)(2) applied to the interest on the deficiencies in 1981 and 1982. Respondent did not determine or plead that the Liebers were liable for additions to tax for negligence for any of the years in issue and did not plead that the Corbetts were liable for the additions to tax for negligence under section 6653(a)(1) in 1977, 1978, or 1979 and under section 6653(a)(2) in 1977, 1978, 1979, and 1980. Respondent did not move to amend that answer to include these additions to tax. Thus, negligence additions to tax on the underpayments attributable to *447 the Liebers and the underpayments attributable to the Corbetts for 1977, 1978, and 1979 and the interest in 1980, are not before the Court. For purposes of section 6653(a), "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). Generally, the addition to tax for negligence is not imposed where a taxpayer's deductions are taken in good faith and in reasonable reliance on advice of a competent tax expert. Otis v. Commissioner, 73 T.C. 671, 675 (1980), affd. without published opinion 665 F.2d 1053 (9th Cir. 1981). Petitioners presented the testimony of Frank M. Lieber (Lieber) and his tax attorney, Leonard D. Rutstein (Rutstein), that Lieber consulted with his tax attorney to determine that the investment for PIMA was prudent. The parties agreed during trial that the testimony on behalf of the Corbetts would be essentially the same as that of Lieber. Lieber did not remember *448 the details of his conversation with Rutstein, but the investments had been brought to Lieber's attention by Rutstein. Although Rutstein did not recall specific discussions with Lieber, he had invested in PIMA himself. He read the offering memorandum and concluded that the shopping center investment was attractive. He considered both the investment features and the tax benefits. We believe from the evidence that Lieber relied on Rutstein in entering into the partnerships. Petitioners' deficiencies result from disallowance of losses shown as their distributive shares on partnership tax returns. Disallowance of the deductions, which we have for the most part sustained, occurred because of the mischaracterization and erroneous classification of items as expenses rather than items to be capitalized and depreciated or amortized. On this record, the additions to tax for negligence will not be sustained. The section 6661 addition to tax determined in the notices of deficiency is for substantial understatements of tax by all petitioners for 1982. Section 6661(a) provides that, if there is a substantial understatement of income tax for a taxable year, there shall be added to the tax *449 an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. Respondent determined in the notices of deficiency that the Corbetts are liable for a substantial understatement addition to tax in 1982 equal to 25 percent of the total deficiency and that the Liebers are liable for a substantial understatement addition to tax in 1982 equal to 10 percent of the total deficiency. Respondent has not timely asserted the 25-percent rate against the Liebers and is limited to the amount determined in the statutory notice. See Oakes v. Commissioner, T.C. Memo. 1988-125. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). In calculating understatements under section 6661(a), items for which there was substantial authority or with respect to which all relevant facts were adequately disclosed in the tax return, or in a statement attached to the tax return, are not to be considered. Sec. 6661(b)(2)(B). As discussed throughout this opinion, there was no substantial authority for the deductions taken by the partnerships and *450 disallowed. See Antonides v. Commissioner, 91 T.C. 686, 700-704 (1988), affd. 893 F.2d 656 (4th Cir. 1990). Relevant facts were not disclosed on the partnership returns. The substantial understatement additions to tax will be sustained for 1982. Conclusion
A majority of the deductions taken by Harris-Winters Phase I partnerships, PIMA, FAIR, and CASA, in the early years of the partnerships should have been capitalized and, in most instances, amortized over the lives of the underlying assets or loans. In this opinion, we have sustained respondent's determinations for all deductions, except organizational expenses (those expenses should be amortized under section 709(b) to the extent detailed in this opinion) and the guaranteed payments to partners in 1978 and 1979. We have likewise disallowed the investment tax credits and held that petitioners are liable for certain additions to tax set out in the notices of deficiency, subject to the Rule 155 computation. With respect to all of the issues discussed in this opinion, we have considered the other arguments of the parties, and they are either without merit or not *451 necessary in view of our resolution of the issues. Based upon the foregoing and concessions of the parties, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Frank M. and Barbara A. Lieber, docket No. 41749-86; Frank M. and Barbara A. Lieber, docket No. 43030-86; John M. and Nancy S. Corbett, docket No. 10490-87; and John M. and Nancy S. Corbett, docket No. 12240-91.↩
1. The additional interest pursuant to sec. 6621 is based upon the entire amount of the deficiency for each taxable year.↩
1. The additional interest pursuant to sec. 6621 is based upon the entire amount of the deficiency for each taxable year.↩
2. The addition to tax pursuant to sec. 6653(a)(2) is based upon the entire amount of the deficiency for each taxable year.↩
1. The current interest amount for 1980 has been stipulated to by the parties in the record at both $ 3,500 and $ 35,000. Although the stipulations are internally inconsistent, $ 3,500 appears to be the correct figure.↩