### In re HILLSBOROUGH HOLDINGS CORP., et al., Debtors.

### HILLSBOROUGH HOLDINGS CORP., et al., Plaintiffs,

v.

### UNITED STATES of America, Defendant.

Bankruptcy Nos. 89–9715–8P1 to 89–9746–8P1 and 90–11997–8P1.
Adv. No. 91–313.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 3, 1995.

Don M. Stichter, Tampa, FL, Michael Crames, New York City, for debtors/plaintiffs.

Douglas Frazier, Tampa, FL, James D. O'Donnell, Jacksonville, FL, Robert Welsh, Washington, DC, for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

This is the next phase of an ongoing controversy between Hillsborough Holdings Corporation/Jim Walter Industries and its 31 wholly owned subsidiaries (Debtors) and the United States of America (Government). The controversy centers around the alleged

liability of some of the Debtors for various and sundry taxes asserted in these Chapter 11 cases by the Internal Revenue Service (IRS), an agency of the Government. This adversary proceeding, filed by the Debtors, is a suit for declaratory relief in which the Debtors sought a determination of the validity of the various claims asserted by the proofs of claims filed by the IRS, all of which have been challenged by the Debtors. Inasmuch as the issues in this adversary proceeding are the same as those involved in the objection filed by the Debtors, a contested matter governed by FRBP 9014, they have been consolidated for trial.

The issues currently under consideration involve a liability, vel non, of Jim ·Walter International Corporation (JWIC) for the fiscal years of 1983 and 1984 (the DISC issue) and the liability, vel non, of U.S. Pipe & Foundry (U.S. Pipe) for additional taxes based on royalties paid pursuant to a coal mining lease between Jim Walter Resources, Inc., (JWR) and U.S. Pipe (the COAL issue). After the parties concluded their discovery, both issues were scheduled for trial, in due course, but prior to the scheduled trial date the Government filed its Motion for Summary Judgment limited to the DISC issue. In light of this development the trial was postponed by agreement of the parties so that the DISC issue could be resolved first.

It is the Government's position concerning the DISC issue that there are no genuine issues of material fact and that the Government is entitled to a summary judgment as a matter of law. Addressing this issue first, the facts relevant to resolution of this controversy are basically without dispute and are as follows:

### DISC ISSUE

Jim Walter International Corporation (JWIC) is a wholly-owned subsidiary of Jim Walter Corporation. JWIC was organized on October 2, 1973 for the purpose of engaging in international trade as a domestic international sales corporation (DISC). Thereafter, JWIC made a valid election to be treated as a DISC under the provision of § 992(b)(1) of the Internal Revenue Code (IRC) on November 1, 1973. To qualify as a DISC, a

company must, among other things, satisfy a gross assets test at each year end as specified in IRC § 992(a)(1)(B), which requires that at least 95% of the adjusted basis of the assets be "qualified export assets." Included among those assets which qualify as export assets are trade receivables and producer loans. Effective November 1, 1975, and at other subsequent dates, JWIC entered into agreements with various subsidiaries of Jim Walter Corporation whereby the subsidiary granted a sales franchise to JWIC providing that goods produced by the participating subsidiaries would be exported by JWIC. Under this arrangement, the DISC was to receive commissions on all export sales equal to the maximum price allowed under the intercompany pricing rules of § 964 of the IRC.

Commissions, the trade receivables, computed under the outstanding agreements and pursuant to the intercompany pricing rules of § 994 were determined to be $2,211,676 for fiscal year end September 30, 1983 and $1,662,672 for fiscal year end September 30, 1984, respectively. In August, 1984, checks totalling $1,661,676 were tendered by related suppliers to JWIC in partial payment of the 1983 commissions. The remaining amount $550,000 was paid by a producer's loan dated November 30, 1983 due and payable on or before November 30, 1988. In August, 1985, checks totalling $1,132,672 were tendered to JWIC in partial payment of 1984 commissions. The remaining amount of $530,000 was paid by the two producer's loans—one in the amount of $360,000 to the Celotex Corporation dated October 31, 1984 and the other for $170,000 to United States Pipe and Foundry Co. dated November 30, 1989.

The IRS determined that JWIC did not qualify as a DISC in either fiscal years 1983 or 1984 because the related suppliers had not paid at least a "reasonable estimate" of the amount of commissions due for either year within 60 days of the taxpayer's fiscal year ends of September 30, 1983 and September 30, 1984, respectively. Because the trade receivables were based on commissions owed to JWIC by "Related Suppliers" within the meaning of the term as defined in IRC Regs. 1.994–1(a)(3)(ii), and because they were not paid within the 60 day time limit imposed by

IRC § 1.994(e)(3)(i), the IRS determined that the unpaid commissions were not qualified export assets under IRC § 1.993–2(d)(2) or (3). The IRS disqualified JWIC as a DISC for the taxable years ended September 30, 1983 and September 30, 1984 because less than 95% of the adjusted basis of the DISC's total assets at year-end consisted of qualified export assets.

In opposition, JWIC asserts that it does qualify as a DISC for 1983 and 1984 because it did have over 95% of its assets as qualified export assets for those two years. It contends that the two producer loans to U.S. Pipe and Celotex qualify as producers' loans since, although they are both dated more than 60 days after the end of the DISC's fiscal year end, they were in fact made prior to that time, and that those loans otherwise qualify as producers' loans. In addition, JWIC contends that a portion of the related commissions to the extent of $961,307 representing the cumulative total of IRS commission income adjustments related to DISC tax years ending before October 1, 1982.

In the Debtors' view, early payment of commissions via a "deemed entry" representing accumulated IRS adjustments for prior years and commission payments represented by inclusion of producer's loans for the subject years is sufficient to meet the 60 day time requirement.

■ The DISC provisions were enacted as part of the Revenue Act of 1971, Pub.L. No. 92–178, 92nd Cong. 1st Sess. 85 Stat. 497. The purpose of these provisions was to increase the exports of domestic products and thereby (1) improve the deteriorating balance of payments, and (2) reduce the rising unemployment rate. S.Rep. No. 92–437, 92nd Cong., 1st. Sess. *See also CWT Farms, Inc. v. Commissioner,* 755 F.2d 790 (11th Cir. 1985); *LeCrory Research Systems Corp. v. Commissioner,* 751 F.2d 123 (2d Cir.1984). The theory underlying the DISC concept is to place domestic corporations engaged in exporting activities on an equal footing with corporations using foreign subsidiaries. S.Rep., No. 92–437. The method employed to accomplish this goal was a tax incentive for exporters in the form of a partial deferral of federal income taxes on export income

earned by a DISC until it distributed that income.

■ The DISC provisions introduced several new concepts into the area of taxation. The DISC itself is not subject to tax. I.R.C. § 991. Rather, its shareholders are taxed directly on a specified percentage of the DISC's current taxable income as if that amount has been distributed as a dividend at the end of the tax year. I.R.C. § 995(a). The portion of the income which is taxable to the DISC's shareholder is a deemed distribution and is denominated as previously taxed income. The remaining tax-deferred income is denominated accumulated DISC income. It is not taxed to the DISC's shareholder until the DISC distributes it to its shareholder, the shareholder disposes of its DISC stock, or the DISC loses its special status. I.R.C. § 995(b) and (c). The DISC benefits were intended by Congress "to encourage reinvestment of the exempt earnings in export activities." *LeCrory Research, supra.; CWT Farms, supra.*

In addition to the deferral of taxes, several rules of taxation which apply to others are waived for the DISC. Unlike other entities under the tax law, a DISC may be merely a "shell" corporation whose sole function is its use as an accounting device for measuring the amount of export earnings subject to tax deferral. *See* IRC § 1.992–1(e). Provided it meets certain intercompany pricing rules, a DISC can deal with related parties without complying with the "arm's-length transaction" requirements that other entities must meet when dealing with related parties. I.R.C. § 994.

■ In return for substantial tax benefits provided for DISCs, Congress imposed stringent requirements upon qualification as a DISC to insure that the tax deferred profits would actually be used for export activities. and not diverted either to production for the domestic market or to overseas manufacturing. *Thomas International, Ltd. v. United States,* 773 F.2d 300 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986). Once a corporation has been properly organized and filed an election to be treated as a DISC, I.R.C.

§ 992(a)(1)(C) and (D), it must meet certain income and assets tests pursuant to I.R.C. § 992(a)(1)(A) and (B). The failure to satisfy either the income or assets test causes disqualification as a DISC. In that case, the DISC benefits, i.e. the income deferred from taxation, will be recaptured. The recapture of the accumulated DISC income is spread out over a period equal to two years for each year that the DISC was in existence, up to a maximum of 10 years.

The income test requires that at least 95% of the DISC's gross profits consist of "qualified export receipts." These are receipts of commissions based on sales or leases of property manufactured in the United States by someone other than the DISC to be used outside the United States, or from providing services in connection with the sale or lease of such export property. The qualified export receipts requirement was designed to limit the application of the deferred tax treatment provided by the DISC provisions of the IRS Code to situations which involve export transactions. H.R.Rep. No. 92–533, 92nd Cong. 1st Sess. (1971).; S.Rep. No. 93–437, 92nd Cong. 1st Sess. (1971).

■ The assets test requires that at least 95% of the DISC's assets qualify as export assets at the close of the DISC's taxable year. "Qualified export assets" include inventories, export property, necessary operational equipment and supplies, trade receivables from export sales, and producer's loans. The qualified export asset requirement was designed to insure that there is tax deferral only on earnings that are reinvested in the export business. *LeCrory Research, supra; Dresser Industries, Inc. v. Commissioner,* 92 T.C. 1276, 1989 WL 64601 (1989) *aff'd in part and rev'd on an unrelated issue,* 911 F.2d 1128 (5th Cir.1990).

■ Section 993(d) allows a DISC to lend its tax-deferred profits to affiliated producers of U.S. export goods without endangering either its DISC election or its deferral of income from taxation. Such loans qualify as "qualified export assets" and interest on the loans constitutes a "qualified export receipt." *See* I.R.C. § 993(a)(1)(F), (b)(5), (d); Treas.Reg. § 1.993–1(g). Thus, producer's loans to the DISC's related suppliers can be used to meet the statutory requirement that 95% of the DISC's assets be held in "qualified export assets."

■ To qualify as a producer's loan, the loan must 1) not exceed the DISC's tax deferred profits as of the beginning of the month in which the loan is made; 2) be labeled as a producers's loan; 3) must be made to a borrower engaged in the domestic production of export property; and 4) be evidenced by a note with a stated maturity date of less than five years from the date of the loan.

In addition, § 993(b)(3) provides that accounts receivables of a DISC will be treated as qualified export assets if the receivables arise by reason of certain transactions of the DISC. However, "commissions receivables" per se are not included in the definition of accounts receivables in § 993(b). Treas.Reg. § 1.993–2(d)(2) does provide that commissions receivable may, under certain circumstances, constitute qualified export assets. Specifically, the Regs. provide, in pertinent part:

§ 1.993–2 *Definition of qualified export assets.*

(d) *Trade Receivables—*

(2) *Trade Receivables representing commissions.* If a DISC acts as commission agent for a principal in a transaction . . . which results in qualified export receivable . . . held by the DISC and representing the commission payable to the DISC as a result of the transaction arises . . . such account receivable . . . shall be treated as a . . . [qualified export asset]. If, however, the principal is a related supplier . . . with respect to the DISC, such account receivable . . . will not be treated as . . . [a qualified export asset] unless it is payable and paid in a time and manner which satisfy the requirements of § 1–994.1(e)(3).

Section 1.994–1(e)(3), in turn, provides:

(i) The amount of . . . a sales commission (or a reasonable estimate thereof) actually charged by a DISC to a related supplier . . . must be paid no later than 60

days following the close of the taxable year of the DISC during which the transaction occurred.

(ii) Payment of the commissions must be in the form of money, property (including accounts receivable from the sales by or through the DISC), a written obligation which qualifies as debt under the safe harbor rule of § 1.992–1(d)(2)(ii), or an accounting entry offsetting the account receivable against an existing debt owed by the person in whose favor the account receivable was established to the person with whom it engaged in the transaction.

■■■■■■ If the commissions receivable is not paid within 60 days of the close of the DISC's fiscal year, the loan is not a qualified export asset and that asset will therefore be counted against the DISC for fulfilling the requirement that 95% of its assets be "qualified export assets." *L & F International Sales Corporation v. United States,* 912 F.2d 377 (9th Cir.1990). The plain meaning of § 993(d)(1)(B) requires that the producer's loan must be evidenced by a time note, not a demand note, with a stated fixed maturity date of not more than 5 years. *CWT Farms, Inc. v. Commissioner,* 755 F.2d 790 (11th Cir.1985).

■■■■■■ In the present instance the producer loan documents on their face show that the documents were not executed until after the 60 day period had expired. To overcome this deficiency, the Debtors' offered testimony to show that the producer loans were intended to comply with the DISC statutes and therefore, although the documents were executed untimely, the loan was actually made within the 60 days and therefore, timely. The flaw with this argument is that if the time the actual loan was made is earlier, then the stated maturity date on the face of the loan exceeds the five year maturity date required by § 993(d)(1)(B). To escape this conclusion, the Debtors' point out that the loan contains a legend which states "the obligation is designated a producer's loan within the meaning of § 993(d) of the Internal Revenue Code." According to the Debtors, this legend supersedes the stated maturity date and fixes the maturity date at five years from the date of the actual loan. Finally, the

Debtors' assert that the maturity of the loan is of no moment since the loans were paid in full before the five year period expired in any event, and, therefore, matured within the five year deadline.

■■■■ In addition, the Debtors contend that an entry to the books must be deemed made consisting of the adjustments made by the IRS in subsequent tax years, even though no actual entry was made in the books of JWIC. The Debtors base this contention on the assertion that the work papers and audit papers of the IRS in which adjustments are made are part of the books and records of JWIC, and although the entry was not actually made in the books of JWIC, the mere existence of these papers in the files of JWIC is sufficient to establish that the adjustment was made and qualify JWIC under the asset test.

This Court is unwilling to accept such an unwarranted gloss attempted to be placed in the undisputed facts established by this record in order to support the proposition that JWIC is qualified as a DISC and, in turn, entitled to the benefits of a DISC corporation accorded by the Internal Revenue Code. It is unfortunate, indeed, that the adjustments required by the disqualification by the IRS were made in later years which might have affected the tax liability relevant to the prior years. The fact remains that the law clearly requires an actual entry in the books of a tax payer before the tax payer is entitled to the benefits of the concept of the "deemed to have been made" requirement of the Code. The inclusion of work papers in the files of JWIC does not constitute an entry into the book.

Based on the foregoing, this Court is satisfied that JWIC failed to meet the requirements set forth in the DISC regulations and did not qualify as a DISC for the tax years 1983 and 1984.

## COAL ROYALTY ISSUE

In the Fall of 1975, Walter Industries formed a subsidiary corporation known as Jim Walter Resources. In December, 1975, U.S. Pipe and JWR entered into a Coal Leasing Agreement dated December 30, 1975

(Agreement). The Agreement was entered into in order to allow Walter Industries and its subsidiaries to enjoy certain benefits, which included the following:

    1) to separate and insulate U.S. Pipe from the mining operations and the selling of coal because of possible strikes, boycotts, or other labor problems, and the substantial liabilities connected with coal mining operations in general;

    2) to manage and measure the performance of the management of the coal mining business separately from the business of U.S. Pipe since the mining and sale of coal was a new profit endeavor; and

    3) to have an arms-length royalty rate between JWR and U.S. Pipe to accurately measure the profitability of each company's separate activities.

Pursuant to the Agreement, U.S. Pipe transferred to JWR all of the coal lands it owned or leased from third parties along with two fully developed and one partially developed coal mine, related mining equipment, and three other coal mines in various stages of planning or preliminary development, with a total invested cost of approximately $72 million. All rights to mine both the surface and underground coal on all lands owned by U.S. Pipe and leased from third parties were assigned to JWR from U.S. Pipe in the Agreement. The Agreement provided for the payment of a 10% royalty by JWR to U.S. Pipe on all coal produced. The Agreement provided for an initial twenty year term, with an option to renew the leases for an additional ten years. The Agreement contains no provision for renegotiation of the 10% royalty rate and the lease did not state any minimum or advance royalty provisions.

Pursuant to the Agreement, U.S. Pipe assigned to JWR the right to mine coal on (1) approximately 33,280 acres on lands owned by it in fee simple absolute and on (2) approximately 36,305 acres on lands it had leased from third parties prior to December 10, 1975. U.S. Pipe and JWR agreed that any and all coal mining properties leased by U.S. Pipe subsequent to December 10, 1975, would in turn be subleased or assigned to JWR pursuant to the Agreement, for the 10% royalty rate. In the years subsequent to December 30, 1975, U.S. Pipe did lease from third parties approximately 30,702 additional acres which were also assigned by it to JWR.

Prior to the entering into the Agreement, U.S. Pipe and JWR sent a copy of the proposed Agreement to the National Office of the Internal Revenue Service (IRS) with a request for a Private Letter Ruling concerning the possible tax consequences of the Agreement. The Request for Ruling, which was dated October 1, 1975, set forth the business purposes for the proposed arrangement between U.S. Pipe and JWR and the 10% royalty rate and requested the IRS to rule, among other things, that the arrangement would qualify for capital gain treatment pursuant to I.R.C. § 631(c). On January 9, 1976, the IRS issued a Private Letter Ruling to the parties stating that the royalty payments from JWR to U.S. Pipe would qualify for long-term capital gain to U.S. Pipe in accordance with IRC § 631(c). The Private Letter Ruling issued by the IRS was based in part on its review of the Agreement between U.S. Pipe and JWR, and upon the representation that the Agreement would be at arms-length transaction based on facts and circumstances known at the time to each of the contracting parties. The Private Letter Ruling was not conditioned on any amount of the royalty rate fixed by the Agreement.

During the tax years fiscal years August 31, 1983 through August 31, 1987 and May 31, 1988 through May 31, 1990, U.S. Pipe maintained a "Lands Division," which on the average had ten to eleven full-time employees and an operating budget which ranged between $300,000 and $400,000 a year which administered, managed, and negotiated leases for coal properties with third parties which were, in turn, assigned to JWR pursuant to the December 30, 1975 Agreement.

Although the tax return of both JWR and U.S. Pipe have been audited over the years it was not until well after the commencement of the Chapter 11 cases of both JWR and U.S. Pipe that the IRS challenged the royalty provision of the Agreement, contending that the 10% royalty provision was not a fair market rate for coal mining royalties because

it was not negotiated as an arms length transaction. It is the contention of the IRS that the fair market rate should not have been more than 6%. Of course the Debtors contend that the 10% rate represents the percentage of royalty and was consistent with the prevailing fair market rate. Both the IRS and the Debtor presented testimony of experts concerning the coal royalty provisions of the Agreement. By the nature of this industry, coal royalty agreements are generally confidential documents, seldom recorded on the public record, and industry experts often come by their knowledge of the specific terms of an agreement by their involvement with the entities which were parties to the agreement. Thus, brief description of the Debtors' lands and mines should be helpful to place the experts' opinions into context concerning the fair market rate for coal royalties during the relevant years.

The land involved is located in Tuscaloosa and Jefferson counties in Alabama. At the time the Agreement was executed in 1975 there was already one mine actively operated, the Blue Creek Mine by U.S. Pipe. The coal seams in this mine are 2 to 3000 feet below the surface, requiring deep below ground mining, utilizing the so-called long wall method of mining. Although the coal seams are of a superior quality, they are very deep in width and when the coal is extracted it is unavoidable to bring out rocks with the coal which, after the washing process, causes a loss of almost 40 to 50% of the coal extracted. Both the Blue Creek Mine the other minable land apparently all have some faults and parting. However, none of them so far have caused any measurable negative impact on the mining operation. The mines are extremely rich in methane gas which, in earlier years, was considered to have a negative impact on the value of any mining lease because it represented a serious health hazard. Today, if handled properly, utilizing a method of capturing the gas obtaining what is called Gob gas, is beneficial because it is a marketable commodity. The land is surrounded with excellent transportation facilities: the Grand Warrior River for transportation by barge to Mobile, an excellent seaport and through the intercoastal waterway up to Pittsburgh; the C & S Railroad for transportation by train; and an excellent interstate highway system for transportation of the coal by truck. The record reveals that at the time relevant coal sold for $72.00 per ton. None of the experts have been able to locate any mining leases comparable to the lease under consideration.

The expert presented by the Government is a geologist with a master's degree and is employed by the IRS as an expert appraiser of coal mining rights particularly in connection with auditing tax shelters involving coal mining operations.

■ There is nothing in this record which warrants a finding that the percentage of royalty provided by the Agreement represented a fair market rate. On the contrary, the highest possible market rate was placed by experts not to exceed 6%. However, a disturbing element of the controversy before the Court rests with the private letter ruling issued by the Government. JWR sought the private letter ruling, providing the Government with the lease itself, and information regarding the relationship between JWR and U.S. Pipe. Finally, JWR represented to the Government that the lease had been negotiated at arms-length. The Private Letter Ruling issued by the Government on January 9, 1976 established that the 10% royalty rate included in the lease qualifies for long term capital gain treatment to U.S. Pipe. The Private Letter does not provide for any contingencies or exceptions to the ruling.

■ Private Letter Rulings issued by the National Office of the Internal Revenue Service are binding on the Service's district office in its determination of a taxpayer's liability for the specific transaction discussed for the particular year at issue. Rev.Proc. 92–1, 1992–1 IRB § 11.03 (Jan. 6 1992). However, such a ruling is not binding where there has been a misstatement or omission of material fact in the ruling request. 26 CFR § 601.201($l$)(2); Rev.Proc. 92–1, *supra.* at § 11.02. *See also Dickman v. Commissioner,* 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1957); *Birmingham Business College, Inc. v. Commissioner,* 276 F.2d 476 (5th Cir. 1960); *Columbo Club, Inc. v. Commissioner,* 54 T.C. 100, 1970 WL 2397 (1970).

According to the Government the Debtor misrepresented material facts by representing that the lease was entered into at "arm's length." However, this is not a representation of fact, but rather an ultimate conclusion. The Government certainly had the actual lease to consider, and as a part of issuing the private letter ruling, made a determination that the rate of the lease was sufficient to allow capital gain treatment to Pipe. The Government noted no exceptions to the Ruling, never pointed to the failure of renewals, the length of the term of the contract or the relationship between the two parties to the lease. For this reason, this Court is satisfied that there was not a material misrepresentation of fact by the Debtor in seeking the private letter ruling, and therefore the ruling issued by the Government is binding on the Government.

A separate Final Judgment will be entered in accordance with the foregoing.